# Richmond

## Simon Boggs v. Commonwealth of Virginia.

December 2, 1957.

Record No. 4744.

Present, All the Justices.

The opinion states the case.

*G. Mark French*, for the plaintiff in error.

*R. D. McIlwaine, III, Assistant Attorney General (J. Lindsay Almond, Jr., Attorney General*, on brief), for the Commonwealth.

MILLER, J., delivered the opinion of the court.

Simon Boggs was convicted by a jury of murder in the second degree and sentenced to twenty years' confinement in the penitentiary for killing Woodrow Mullins during an altercation which was primarily between Boggs and Ray Bolling.

The evidence is sufficient to sustain a finding of murder in the second degree, but accused assigned numerous errors which he asserts were made during the trial and for which he moved that the verdict be set aside. Those material to the questions presented may be stated as follows:

The court erred during the progress of the trial by its failure promptly and effectively to exclude prejudicial evidence; in the admission of evidence harmful to accused; and in the refusal of instructions.

To understand Boggs' contentions, it is necessary to state the pertinent evidence and relate some incidents of the trial.

Woodrow Mullins operated a coal mine in Wise county, Virginia, from which Boggs and Ray Bolling hauled coal by trucks. The latter two were brothers-in-law, accused's wife, Pauline, being Bolling's sister.

Several years previously Boggs had beaten his wife and there had been trouble between Bolling and accused growing out of that incident. On that occasion Boggs was challenged to a fight by Bolling but he declined to engage in an encounter. He threatened instead to shoot Bolling. The antagonism engendered at that time seemed, however, to have been forgotten, for no other trouble had been experienced between these men until the morning of the homicide.

On the evening previous to the homicide Boggs and his wife had engaged in an altercation in which she had been beaten and driven from their house, and Bolling had learned of this mistreatment of his sister.

Ray Bolling testified that about seven o'clock on the morning of September 28, 1956, he drove by Boggs' house to take him down to where coal was to be dumped from trucks loaded the previous day, but not finding Boggs, he drove to the home of accused's brother and found him there. When Boggs came out, he stated that he had experienced some trouble during the night and asked Bolling to unload his truck and move it from the ramp where it had been left the previous afternoon. He was then dressed in a work shirt and overall pants, and Bolling observed the print of a pistol in his front pocket. Others were present in Bolling's car, and he then said nothing to Boggs concerning the latter's mistreatment of his wife although he said that he had intended to do so.

Bolling unloaded and moved accused's truck as requested, and Boggs took his truck and drove to a service station where he had a drink. Bolling then proceeded in his truck to the area of the mine, and being aware that Boggs was armed, he carried a pistol. He said that he intended to disarm Boggs and again offer accused an opportunity to "see if he could give me a whipping like he did my sister." When Bolling arrived at a fork in the road on his way to the mine, he found Woodrow Mullins and Clyde Mullins removing a fallen tree from the lower branch of the road. He assisted them in their work, and then waited for Woodrow and Clyde Mullins to finish sawing a tree on the upper fork. About that time accused passed Bolling in his empty truck and proceeded down the lower fork of the road for a load of coal. He returned later to the fork with his loaded truck and asked Bolling for a drink. Bolling replied that Woodrow and Clyde Mullins had a drink with them on the upper road. Accused then alighted from his truck; Bolling covered him with a pistol and asked Boggs where his gun was. Accused stated that he had left it at his brother's home and pulled his coat aside to show Bolling that he was unarmed. Bolling observed no weapon, nor could he see any print of a gun in Boggs' pocket.

Deceased saw the altercation, came down from the upper road, and asked the two men to forget their differences. Bolling said he thereupon gave his weapon to deceased and informed him that he wanted to see Boggs "beat me up like he did my sister." He removed his coat, placed it on Boggs' truck and at that time accused pulled a pistol which he had behind him under his coat and demanded that Woodrow Mullins drop the gun that Bolling had given him. Mullins, standing to the left some six or eight feet from

Bolling and slightly above the latter in the upper road, hesitated; accused then cursed him and repeated his command. Bolling thereupon looked over his shoulder and told deceased to drop the pistol and he did so. Boggs then exclaimed to Bolling, "You was going to kill me, wasn't you?" Bolling's reply was that he was just going to see if he could give him a good whipping, and then Boggs shot three times. The first shot missed, the second hit Bolling in the right shoulder, and the third struck Mullins and inflicted a fatal wound from which he died before medical help was obtained.

Boggs' testimony as to what happened is materially different. He said that when he reached the forks in the road with his loaded truck, Bolling asked how he was feeling and said, "Would you like to have a drink?" and suggested that they go to where a nearby keg had been placed. Accused alighted from his truck and as he did so, Bolling drew a pistol on him. Boggs gives this account of what then transpired:

"He said, 'Here is your God damn drink of liquor.' I said, 'Wait a minute. What is this all about?' He said, 'God damn you, you know what it's all about. You pulled my sister's hair out last night.' I said, 'You get the straight of it before you kill somebody.' He said, 'Where's your gun. I know you have got it, God damn you.' And I said, 'Ray, let's not have no trouble' and seemed like he said, 'Have you got it in the truck?' I am not definite whether he said that or not. Anyway, at that time Woodrow walked down behind him kindly on my left, in that direction, and Woodrow says, 'Ray put that old gun up' and Ray definitely—he didn't act like he knew he was behind him. Ray kindly wheeled and said, 'I'm going to kill the son of a bitch.' When he wheeled I started shooting. I shot three times about as fast as I could fire. He dropped his gun. I quit shooting. It all happened so quick, the first I knowed Woodrow was hit."

He further testified that he shot at Bolling in self-defense because he "thought it was either him or me"; that he did not shoot at Mullins, for deceased was one of his best friends, and when he saw Mullins was hit, he ran to him and was holding Mullins' head in his arms when he died.

Before counsels' opening statements were made, a pre-trial conference was held by the judge, the Commonwealth's Attorney, Mr. Asbury, Messrs. Greear and Long, who assisted in the prosecution, and Mr. G. Mark French, counsel for accused. Mr. French insisted that details of the altercation between accused and his wife on Sep-

tember 27, 1956, in which Pauline Boggs was rather severely beaten should not be admitted in evidence. He also stated that accused had been previously convicted in a federal court for a felony, *i.e.*, manufacturing or illegally having in his possession intoxicating liquor, and insisted that for impeachment purposes, the Commonwealth should be limited to asking accused if he had been convicted of a felony, and if he answered in the affirmative, that no further inquiry should be allowed. Section 19-239, Code 1950. No order was entered incident to the conference, but the judge indicated that the Commonwealth should not go into the details of accused's conviction for a felony but could inquire of him whether he had been convicted of a felony or felonies. No ruling was made upon whether or not the Commonwealth would be allowed to prove the details of the altercation between accused and his wife on the previous evening.

When the opening statement was made by the Commonwealth's Attorney in referring to Boggs' conduct on the evening of September 27 and Pauline Boggs' condition, he said that Boggs "had been drinking heavily" and had been to neighbors' homes looking for her with a flashlight and gun, and when told that she was not there, he called them liars; that accused's wife "was hurt, beaten up. You will hear the evidence in the case; she was beaten up considerably." Thereafter in chambers objection was made by accused to this part of the Commonwealth's opening statement as being prejudicial by showing "commission of other offenses." One of counsel replied, "We take the position that Mr. Asbury could have gone much further than he did in the statement. He didn't state anything about Simon beating his wife up; that wasn't mentioned. He said she came to this house and was in bad condition. * * * We don't know he beat his wife up and we don't charge he did." Upon further objection by counsel for accused to proof of the details of that altercation, one of counsel for the prosecution said, "We are not going into the details, who was in the right in the trouble with his wife. But we want to show what brought it on and I think we are entitled to that. That is the only reason it was mentioned." The court then overruled accused's objections.

Callie Bowman, a witness for the Commonwealth, was questioned in detail as to accused's conduct on the evening of September 27, 1956, and testified over accused's objection that he had come to her house searching for his wife with a flashlight and pistol, and asserted that he was going to "kill her." She further said that after

accused left, Pauline Boggs did come to her home "in pretty bad condition" and was secreted in her bedroom when accused came back later with flashlight and pistol, and again threatened to kill her if he found her.

Over objection, Winfred Stallard testified that accused came to his home with a flashlight and pistol looking for his wife and said that "he was going to kill the damn whore if he could find her."

When accused testified, he admitted that he had an altercation with his wife, struck her, and pulled her hair, but stated that she had attacked him first; had asked and gotten their small child to bring her a rifle with which she threatened to shoot him.

In testifying about this phase of the case, Ray Bolling said that on the evening of September 27th he learned that Boggs and his wife had engaged in an altercation and that in response to a telephone call, he went to Jack Grubbs' home, where he found his sister and took her home with him. He and his wife put her to bed for the night, and he said that "she was in pretty bad shape. He almost had to carry her in the house."

When accused testified, he was cross-examined at length about his conduct toward his wife and former convictions. He was asked how many wives had he had to which he answered, "Four. I have been married five times," twice to his then wife. He was then asked on what grounds his wife had divorced him years previously. Upon answering that it was for adultery, he was asked if it was not also for cruelty. He was then asked if he had not been away for some months. Upon answering in the affirmative, inquiry was then made as to when "he got back" and where he had been, and this answer was elicited from him:

"I had been in the Federal Reformatory pulling some time for four gallons of whiskey." Then he was asked how long they kept him "in the Federal prison" and his answer was "Nine months and seven days, I believe." This was objected to as improper cross-examination. Specific objection was made to the questions relating to the details of his former convictions. His counsel asserted that he could only be asked if he had been "convicted of a felony." One of counsel for the Commonwealth replied, "I was not asking for that purpose; I had another thing in mind." Yet what he had in mind was not stated. Counsel for accused thereupon said, "We object and ask to strike it from the evidence." The court overruled the objection.

Later counsel for the prosecution referred again to Boggs' in-

carceration under conviction by the federal court by asking if the mistreatment of his wife on September 27 was not the first time he "had beaten her up since you came back from Federal Prison." He was then subjected to considerable examination as to why he had beaten his wife, and if it was not because she had not cooked his supper, and if he had not accused her of going out with another man.

After further cross-examination upon what transpired when Mullins was killed, accused was asked if he had been "convicted of a felony in this county" and his answer was "In 1928, yes sir." One of counsel for the Commonwealth then undertook to read an order entitled, Commonwealth, Plaintiff v. Simon Boggs, and counsel for Boggs objected on the ground that accused had admitted having "been convicted of a felony." The court sustained this objection, yet counsel persisted and inquired, "Now, were you convicted again in this court on * * *?", to which unfinished question accused objected and the trial judge and counsel retired to chambers for consultation. Upon return to the court room, the court overruled accused's objection, and his examination continued as follows:

"Q. Now, you said you had been convicted in 1928. I will read you an order dated on the 18th day of August, 1939, Comm. vs. Housebreaking, Simon Boggs. Do you remember that case?

"A. There wasn't any conviction on that, was there?

"Q. Yes. 'After hearing opening statement of counsel and the evidence and being instructed by the Court retired to their room to consider of their verdict and after some time returned into court having found the following verdict, to-wit: We the jury find the defendant guilty of assault and battery and fix his punishment at twelve months in jail. C. R. Simpkins, Foreman.' (reading from Order Book).

"A. That's right, assault and battery.

"MR. FRENCH: We object. This is not a felony.

"MR. GREEAR: Well, it was an indictment for a felony.

"MR. FRENCH: We object.

"THE COURT: Sustain the objection. That goes out, as it was a misdemeanor.

"MR. GREEAR: I believe it was house breaking with intent to commit a felony.

"MR. FRENCH: That is not conviction of a felony.

"THE COURT: That goes out, gentlemen of the jury. You will disregard that."

Stella Mullins, widow of deceased, testified in part as follows:

"Q. Did he [deceased] come to your all's home on the evening before he was killed next morning?

"A. Yes, sir, he did. He come in from work, and do you want me to go ahead and tell about the money?

"Q. Yes.

"A. He come in from work and went to take a shower and he laid his billfold on the mantel, and when he come back out I said, 'I have to have some money to pay for the laundry.' He said, 'There is my billfold on the mantel. Take what you want.' I took $10.00. That left a $20, a $5.00 and some $1.00's, looked like about three one's and all this small change was doubled up and he had three $100.00 bills straightened out in his billfold."

    \*      \*      \*      \*      \*      \*      \*

"Q. You don't know what he did with that money he had?

"A. No, I don't, but I checked at the bank and he hadn't put it in the bank. He could have had more on him than that, because he packed a lot of money.

"Q. Did he ordinarily carry money?

"A. He certainly did. I have seen him with as high as $1,000.00 in his billfold at one time, because I always fussed at him for packing money."

Objections to these questions and answers were overruled.

Near the conclusion of the Commonwealth's case Bill O'Dell, a mortician, was called to the stand. He had gone to where deceased was lying dead with Boggs standing nearby, the latter having remained with Woodrow Mullins when Clyde Mullins and Ray Bolling went for an ambulance. After O'Dell testified to some statements Boggs made about how and why the shooting took place, these questions were asked and answered:

"Q. Did he have a pocketcase on him?

"A. Sure did.

"Q. How much money was in it?

"A. I don't know exactly. I opened the pocketbook and looked at it."

Accused objected and the following colloquy was had:

"MR. GREEAR: We think it is material.

"THE COURT: I don't see the connection.

"MR. GREEAR: We have shown there was no one with him except

Simon from the time he was shot for 15 or 20 minutes. And we have shown the amount of money he had on him the evening before. I think that is material."

After some further discussion, accused's objection was sustained. Yet this testimony was not stricken out and notwithstanding the court's ruling, counsel for the Commonwealth thereafter persisted in his inquiry as follows:

"Q. What did you do with the pocketbook?

"A. I put the pocketbook over on the cabinet with other personal effects, his knife, keys and cigarette lighter, handkerchief and two packs of cigarettes.

"Q. What was done with them later?

"A. I put them in the folder and next morning the family called me if I had got this and I took them to them. I turned it over to his brother Edgar."

Nor did the court at any time exclude the testimony given by the widow as to the amount of money deceased carried upon his person.

Did the court err by admission of irrelevant and prejudicial evidence and by its failure to exclude promptly and effectively from the jury's consideration evidence that was inadmissible but harmful to accused?

■ To be admissible, evidence must relate and be confined to matters in issue, and it must tend to prove or disprove these matters or be pertinent to them. It is fundamental that evidence of collateral facts or those incapable of affording any reasonable presumption or inference on the matter in issue because too remote or irrelevant cannot be accepted in evidence. 20 Am. Jur., Evidence, § 248. Such evidence tends to divert the attention of the jurors to immaterial matters. If it has to do with other misconduct or other crimes committed by accused, it not only diverts the attention of the jurors, but may tend to prejudice them towards accused. 20 Am. Jur., Evidence, § 309. However, evidence that tends to prove the crime charged or the motive of accused or malice on his part toward his intended victim is admissible though it may necessarily involve the commission of other crimes or other misconduct on his part. *Webb v. Commonwealth*, 154 Va. 866, 152 S. E. 366; *Parsons v. Commonwealth*, 138 Va. 764, 121 S. E. 68; 5 M. J., Criminal Procedure, § 59; 20 Am. Jur., Evidence, §§ 248, 309; Law of Evidence: Va. & W. Va., § 88, p. 155.

■ Boggs' misconduct towards his wife did not legally justify Bolling in undertaking to administer a beating to accused. Yet Bolling's resentment was natural and his desire to inflict some punishment upon accused for what he had done to Bolling's sister is understandable. Thus, the Commonwealth was entitled to prove that accused had beaten his wife, that Ray Bolling had knowledge of that fact, and accused was aware that Bolling knew of it. That evidence was admissible because from those facts it could be inferred that accused anticipated that Bolling might call him to account and carried a pistol the next morning in expectation of that occurrence. However, the Commonwealth was not entitled to place before the jury a prolonged and detailed recital of Boggs' misconduct and threats toward his wife, nor the wholly irrelevant evidence as to how many times he had been married during his life, or the cause of his divorce at one time from his wife. Also irrelevant to the issue was the widow's testimony as to what sums of money her husband had on his person or customarily carried. The court did ultimately sustain the objection to a part of O'Dell's testimony about what money was in deceased's pocketbook when the mortician took charge of the body where only Boggs was in attendance. Yet the court's ruling was inadequate and counsel for the Commonwealth persisted in his examination to such an extent as to render the court's admonition wholly ineffective. Any questions to O'Dell upon this subject should have been forbidden and the irrelevant testimony of the widow effectively stricken from the record.

■ There is no explanation why counsel for the Commonwealth considered relevant this testimony that had to do with what money deceased had on him the previous evening and what he did not have when the mortician arrived where deceased lay dead and found only the accused present. The natural, if not the only, inference that the jury could have drawn was that accused had robbed deceased after he died, an inference unsustained by the evidence but most detrimental to accused.

After accused had been asked, as permitted by § 19-239, Code 1950, and admitted that he had been convicted of a felony, the court should have been alert to forbid the introduction before the jury of the record of the indictment of Boggs for housebreaking, upon which he was convicted of a mere assault and battery. Accused's objection to introduction of the record of this indictment for housebreaking was first overruled and then ultimately sustained. Yet

the full damaging effect of the indictment's implication had been placed before the jury by recital of the crime for which he was indicted and the misdemeanor for which he was convicted by reading at length from the order of conviction. The mere statement by the court "That goes out, gentlemen of the jury. You will disregard that" was most probably ineffectual to erase its prejudicial effect from the minds of the jurors.

The effect of this volume of irrelevant and prejudicial evidence, some of which the jury was told to disregard, but some of which was left before them, along with the statements made in the presence of the jury, was undoubtedly harmful to accused. It was sufficient to divert the jurors' attention from the main issue, arouse their resentment, and prompt them to give unwarranted effect to other misconduct and other crimes committed by accused for which he was not then on trial. No motion for a mistrial was made during the progress of the case, but accused objected to the admission of most of this irrelevant and prejudicial evidence, and he objected to some of the statements made in the presence of the jury that emphasized this improper evidence, and moved to set aside the verdict.

If the effect of what transpired was calculated to prejudice the accused before the jury and the court failed effectually to instruct the jury, or if the baneful consequences of what was heard by the jury were not or could not be erased, then a new trial should be ordered. *Harrison* v. *Commonwealth*, 183 Va. 394, 32 S. E. 2d 136.

We are convinced that the cumulative effect and harmful consequence of improper evidence heard by the jury prevented accused from having that character of impartial trial to which one, however guilty he may be, is entitled, and for that reason a new trial must be ordered.

■ Was the following instruction No. 10 improperly refused?

"The Court instructs the jury that when a person reasonably apprehends that another intends to *attact* him for the purpose of doing him serious bodily harm, then such person has the right to arm himself for his own necessary self defense and if he has reasonable grounds to believe that an *attact* will be made upon him then no inference of malice can be drawn from the fact of such preparation."

When Boggs was asked on cross-examination whether he knew on the morning of September 28, 1956, that Ray Bolling had found his sister the previous evening, knew her condition and had taken her to his home for the night, accused replied in the affirmative. He

was then asked if that was not the reason why he was carrying a pistol on the morning of the homicide. He answered, "No." In response to the question, "Why were you carrying it then?", he answered, "I carry a gun in the truck a right smart of the time, and that night I had took the gun and put it in my pocket and I put my gun in my pocket next morning and still had it on me when this thing happened."

This instruction, in almost identical language, was refused in *Bevley* v. *Commonwealth*, 185 Va. 210, 214, 38 S. E. 2d 331, and conviction of accused for voluntary manslaughter was set aside and a new trial ordered because of its denial. However, in that case it was known to Bevley that deceased had attempted to obtain a pistol and had threatened to kill several people, one of whom was accused, and he had thereupon armed himself with a pistol. Nor did accused ever deny that he had armed himself for self protection.

Here Boggs denied that he armed himself because he apprehended trouble from Bolling and denied that he was carrying his pistol for any such reason. He cannot now complain of the refusal of the instruction which is predicated upon the fact that he anticipated trouble from Bolling and carried the pistol because of that fact, and for self defense. On the facts of this case, the instruction was properly refused.

The other assignments of error are without merit and need not be discussed.

For the reasons stated, the judgment complained of will be reversed and a new trial awarded.

*Reversed and remanded.*