# Richmond

GARFIELD ARTIS v. COMMONWEALTH OF VIRGINIA.

September 1, 1972.

Record No. 7964.

Present, Snead, C.J., I'Anson, Carrico, Harrison, Cochran and Harman, JJ.

*John Page Garrett* (*Garrett, Garrett & Garrett*, on brief), for plaintiff in error.

*Gilbert W. Haith, Assistant Attorney General* (*Andrew P. Miller, Attorney General*, on brief), for defendant in error.

HARRISON, J., delivered the opinion of the court.

A jury returned its verdict in the court below finding defendant, Garfield Artis, "guilty of a felony of operation of a numbers racket or game" and fixed his punishment at 5 years in the penitentiary. Sentence was imposed on the verdict and defendant noted an appeal, assigning numerous errors.

Defendant was arrested and indicted for unlawfully and feloniously violating Code § 18.1-340 in the operation or conduct of a lottery commonly known as the numbers game or the numbers racket. The record shows no objection to the form of the indictment, the instructions granted and refused by the court or to the form of the verdict returned by the jury.

On the evening of January 23, 1970 Investigator Tommy Hart, of the Virginia Alcoholic Beverage Control Board, together with six other law enforcement officers, searched the trailer residence of Vernon Harris located in Chesapeake. The officers had obtained a search warrant based on a report that the occupants of the trailer were gambling.

The trailer was occupied at the time by Harris, Artis and four other persons. They were searched and a .32 calibre pistol was found on defendant. Also found on defendant was a wallet which contained $460 in bills of large denominations, and a receipt of the H. C. Young Press, Inc. of Norfolk, Virginia, showing that on January 20, 1970 it received from Melvin Watson the sum of $8.27 for "500 coupon tickets".

When the officers had the men in the trailer stand up to be searched they noticed a coat lying on a chair next to defendant. Artis was the only person in the trailer, other than the owner of the premises,

who did not have on a coat. On January 23, 1970 the temperature never rose above 30° F. Harris testified that it was not his coat. The coat was offered to defendant to try on but he refused. Hart testified the coat would fit Artis. He said that it would not fit Harris because the latter was 5 ft. 10 in. tall and weighed 265 lbs.

The officers searched the coat and found inside its pocket an invoice from the H. C. Young Press, Inc. of Norfolk, Virginia to Melvin Watson, c/o L. J. Dupre, Chesapeake, Virginia, dated January 22, for 500 coupon tickets—$8.27. Also found in the coat pocket were three slips or sheets of paper which bore writings, numbers and markings identified by Hart as records that people keep who take bets from other people in the numbers racket. The three slips recorded, in the aggregate, a total of 79 bets or wagers. There was written on them figures such as "163-15", "516-25", etc. in columns. Hart explained the procedure used to bet, record and collect the bets. He stated that the first three figures (163) represented the number chosen by the person who wished to play a number, and that the last two figures (15) indicated the consideration paid by the purchaser of the ticket for a chance. Or, stated otherwise, the player would bet 15 cents on number 163.

Melvin Watson testified that he and Garfield Artis are members of the Fantastic Club and that Artis is its business agent. It appears that this club planned to sell chances for certain prizes to be given by the club. To accomplish this they needed "coupon books". Watson ordered 500 of the coupon tickets from the H. C. Young Press, Inc., in care of L. J. Dupre, and paid for the tickets. The H. C. Young Press, Inc. executed its receipt to Melvin Watson and Watson testified that he gave the receipt to defendant, Garfield Artis. He further said that Dupre delivered the printed tickets to him and that attached thereto was the invoice. He testified he gave the invoice and the tickets to Artis.

Dupre identified the receipt and invoice and corroborated the testimony of Watson as to the delivery of the receipt, invoice and tickets to Watson.

No further evidence was introduced by the Commonwealth or the defendant.

Defendant questions the sufficiency of the evidence to sustain his conviction under Code § 18.1-340. In *Quidley* v. *Commonwealth,* 190 Va. 1029, 1037-38, 59 S. E. 2d 52, 56 (1950) it was said:

"We need spend little time or space upon the question of the sufficiency of the evidence to connect Quidley and Clanton with promotion or concern in managing or drawing a lottery. The Commonwealth made out a *prima facie* case, and the owners and claimants of the property offered no proof in contradiction.

"It is nowhere questioned that the numbers game is a lottery. It is a form of gambling which has become quite prevalent. We have had for consideration in recent years numerous cases involving the offense. [Citing cases.]

"The possession of a large number of duplicate tickets evidencing chances in such a lottery is relevant and convincing proof that the person is concerned in promoting, managing, or drawing the lottery. The sale, the possession of the evidence of the sale, the collection of the slips, and delivery of them and the money are necessary steps in the operation of the venture. Each step constitutes aid in its conduct."

Code § 18.1-340 in effect prohibits a person from being *concerned* with or *aiding* in managing and drawing a lottery and from having in his possession tickets, chances, writings, etc. under certain conditions for certain purposes. The jury has specifically found that defendant operated a numbers racket or game, an offense prohibited by the statute. The right of the officers to conduct the search and make the arrest is not in controversy. The issue is whether the evidence uncovered by their search is sufficient to show that defendant operated or was concerned with and aided in the operation of the numbers game.

The jury could have found from the evidence before it that the coat which defendant refused to claim, or to try on, was in fact his coat. The owner of the trailer testified that it was not his coat and Officer Hart said that it would not fit the owner. The coats of all other occupants of the trailer were accounted for. The receipt evidencing payment for the Fantastic coupon books was traced to defendant and found in his pocketbook and on his person at the time of his arrest. The invoice evidencing the purchase of these coupon books, plainly a part of the transaction, was found in his coat and likewise traced directly to defendant.

The three slips or sheets of paper found in the coat pocket are obviously records of bets made by persons who were "playing the numbers game". Such records are necessary to evidence the sale,

to show the number selected by the buyer and the amount of his or her wager on that number. The venture of operating a numbers game would not be possible without such a record. It is one step which aids in its conduct. The possession of these records by Artis is unexplained.

The evidence in this case points directly to the fact that Artis was concerned with and involved in the operation of the numbers game and the jury's verdict finds support in the evidence.

■ Counsel for defendant complains of the action of the court in permitting Officer Hart to testify to finding currency in the amount of $460 on the person of defendant. He says it was irrelevant. It is a matter of common knowledge that those who operate the numbers game deal in cash and large sums of currency, rather than through banks where minute records are kept of deposits and withdrawals, and where the nature of the deposit is shown, whether by check, currency or coin.

While the raid and search were made because defendant and his companions were suspected of gambling, and the amount of currency found there could properly be shown in any prosecution of him for gambling, this was also relevant evidence in the prosecution of defendant for operating a numbers game. We can envision no prejudice that the defendant could have suffered by the introduction of this evidence.

■ Neither do we find any error in the action of the court in permitting the Commonwealth to show that defendant refused to try on the coat in which the incriminating evidence was found. The general rule which governs tacit admissions applies here. It is properly stated in *Owens* v. *Commonwealth*, 186 Va. 689, 699, 43 S. E. 2d 895, 899 (1947) where we said:

> " '. . . In order that the silence of one accused of crime following a statement of a fact tending to incriminate him may have the effect of a tacit admission, he must have heard the statement and have understood that he was being accused of complicity in a crime, the circumstances under which the statement was made must have been such as would afford him an opportunity to deny or object, and the statement must have been such, and made under such circumstances, as would naturally call for a reply. The test is whether men similarly situated would have felt themselves called upon to deny the statements affecting them in the event they did not intend

to express acquiescence by their failure to do so. \*\*\*' " *See also Baughan* v. *Commonwealth,* 206 Va. 28, 141 S. E. 2d 750 (1965).

The admission of evidence of defendant's failure to try on the coat was not done in violation of his privilege against self-incrimination. Such privilege applies only to evidence of a testimonial nature and not to physical evidence or evidence of actions or occurrences.

The officers suspected and believed that the coat in which the incriminating evidence was found was the coat of defendant. Believing this they would have been derelict in their investigation had they not asked defendant to try on the coat, thereby giving him an opportunity to allay and refute the suspicion and accusation of the officers.

█ The assignment of error which questions the propriety of the Commonwealth showing that defendant was in possession of a pistol at the time of his arrest presents a more serious question. So far as the record discloses the raid of the Harris trailer was not precipitated because he, or the others gambling therein, were suspected of being involved in the numbers game. The complaint to the police was that the occupants were gambling. Upon their entry and arrest of the men, they routinely conducted what Hart described as a "preliminary pat search of all the prisoners", at which time they found a gun on defendant. This gun had no connection whatever with the charge preferred against defendant for operating a numbers game. It was not relevant or material. Apparently it was the basis of a separate charge preferred against defendant for carrying a concealed weapon.

Counsel for defendant objected to the admission of evidence that a gun was found on defendant and was overruled. The evidence was admitted, the gun was described, and it was twice referred to by the Commonwealth's Attorney in his argument. The jury attached some significance to the gun for, after they retired to consider the case, they returned to the courtroom and posed the following question to the trial judge:

"A Juror: I would like to know that in the testimony it came out about a gun being found. I want to know what happened to the gun."

The trial judge responded as follows:

"Well, that doesn't make any difference so far as you are concerned. The gun was mentioned in this merely to show why the policemen went there and why they had the right to make the search. We are not trying this man for having a gun. You are not trying him for anything in connection with the gun.

"If he had the gun on him, then it gave the policeman the right to do things that he couldn't have done otherwise in making a search and that is why the matter of the gun was brought out. As to that, the policeman had a right to do it. So you need not consider that at all.

"Is that plain gentlemen?"

It is well settled that proof of another crime is generally inadmissible save under certain circumstances. These circumstances were enumerated in *Kirkpatrick* v. *Commonwealth*, 211 Va. 269, 176 S. E. 2d 802 (1970). This case is clearly not an exception to the general rule for none of the circumstances enumerated in *Kirkpatrick* are present here.

Although we hold that the verdict of the jury in this case is supported by credible evidence, we cannot say that testimony which showed that defendant had a concealed weapon about his person did not influence the jury to find the defendant guilty, or in the quantum of the punishment it imposed. We cannot say that the introduction of this evidence was harmless error and accordingly the case will be reversed.

■ Since there may be a retrial we comment upon two other assignments of error made by defendant. After having called witnesses Hart, Watson and Dupre, the attorney for the Commonwealth requested that six other officers be called. The officers were not sworn. Apparently the Commonwealth's Attorney, addressing them as a group, asked: "I want to know were you gentlemen on the raid with Officer Hart on January 23, 1970?" The officers answered: "Yes, sir." The Commonwealth's Attorney then said: "Your Honor, these are the officers that conducted the raid. Their testimony would be purely cumulative." Counsel for defendant objected. The court said: "He can offer whatever testimony he wants", to which defense counsel replied: "This is not a proper way to conduct it." The attorney for the Commonwealth again stated: "I am making them available to him, Your Honor. Their testimony would be purely cumulative."

The objection of defense counsel was well taken. If the benefit of the testimony of these witnesses was desired they should have been called, sworn and examined as witnesses, or, by consent counsel could have stipulated that were the witnesses called their evidence would be substantially the same as that given by Hart. The effect of his statement was to bolster or strengthen the state's case by vouching that he had six other witnesses whose testimony would corroborate that given by Hart.

■ Defendant further assigns error to the following statement made by the Commonwealth's Attorney in his closing argument and to an observation made by the trial judge:

"Mr. Axson: The evidence in this case, if it is not convincing, I could never bring a case in Court more convincing. I don't know when I have seen in evidence a case—

"Mr. Garrett: Your Honor, I object to this case. His personal opinion, I don't think—

"The Court: The lawyers have a right to express personal opinion."

Also objection was made to this further statement by the Commonwealth's Attorney in his argument: "The fact is, Mr. Artis was, in fact, involved in the numbers racket."

We would observe that arguments of counsel are made extemporaneously at the conclusion of trials that are often protracted and hotly contested. Trial judges customarily and understandably accord counsel reasonable latitude in making their arguments. However, attorneys should assiduously refrain from injecting their own personal opinion of the evidence, or personal opinion as to the competency of witnesses and the weight to be accorded their testimony. Attorneys have every right to argue and comment on the testimony, the inferences and conclusions to be drawn therefrom and any discrepancy therein. This can be done as forcefully and ably as the abilities of the advocate permit, and at such length as the patience of the trial judge will tolerate. It is when counsel inject their own personal views or personal opinions that the argument becomes objectionable and improper. *Smith* v. *Commonwealth*, 207 Va. 459, 150 S. E. 2d 545 (1966).

Counsel are usually respected members of the Bar and often leaders in the community. There always exists the real danger that a lay jury

might accord improper weight to a statement made by counsel in such way or in such language that the jurors could interpret it as his considered personal opinion rather than argument designed to persuade.

In the instant case the statement by the Commonwealth's Attorney that "Mr. Artis was, in fact, involved in the numbers racket" was an unequivocal statement, made by a public official who is the chief law enforcement officer of Chesapeake. The members of the jury could have concluded that the basis of the statement was not necessarily the evidence in the case being considered by them but other information and records of which the Commonwealth's Attorney had knowledge.

For the reasons heretofore assigned, the judgment of the lower court is reversed and the case is remanded for a new trial if the Commonwealth be so advised.

*Reversed and remanded.*