## Richmond

STEPHEN GARY HOWARD

v.

COMMONWEALTH OF VIRGINIA

No. 1308-85

Decided April 5, 1988

COUNSEL

Gerald T. Zerkin (Zerkin, Heard & Scovill, on brief), for appellant.

M. Katharine Spong, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**KEENAN, J.** — Stephen Howard was convicted by a jury of conspiracy to commit capital murder. He was sentenced in accordance with the jury's verdict to twenty years imprisonment. The

issues presented in this appeal are (1) whether Howard was denied his right to a fair trial because the trial was held in the administration building of the Powhatan Correctional Center; (2) whether Howard was denied a fair trial by the manner in which the Commonwealth presented its evidence and argument; (3) whether Howard was denied his sixth amendment right to compulsory process by the trial court's failure to compel the testimony of the victim's brother; and (4) whether the trial court erred in allowing testimony regarding pain suffered by the victim. We affirm Howard's conviction, finding that he was not denied a fair trial or his sixth amendment right to compulsory process, and that although testimony concerning pain suffered by the victim was irrelevant, its admission was harmless error under the facts presented.

## I.

In this case, the jury was empaneled at the courthouse in Powhatan County. The rest of the trial took place at the Powhatan Correctional Center (Center). Prior to trial, Howard requested that the entire proceedings take place at the courthouse. The trial court denied Howard's motion on the ground that security at the courthouse was not adequate to accommodate the twenty-two inmate witnesses who had been subpoenaed by the parties.

At the beginning of the trial, out of the presence of the jury, defense counsel made some observations for the record concerning the trial surroundings. He noted that the administration building was directly across from the main prison compound and estimated that the front door of the building was approximately forty yards from the Center's front gate. Defense counsel further observed that two gun towers and bayonet wire were within view of the administration building.

In response, the prosecutor gave his own description of the administration building and courtroom. He stated:

I think the record also should reflect this administration building is totally outside of the compound. The jurors do not have to come through any bars or any gates. There are no bars on any windows. There are no bars on any doors. It is an administration building. The courtroom is set up with a Judge's bench, with counsel table, with chairs for witnesses,

and a jury bench on an elevated dais. And in all respects it resembles a courtroom.

After hearing these representations, the trial court upheld its earlier ruling denying Howard's motion. The court stated:

The logistics of handling over twenty some inmate witnesses in Powhatan courthouse is out of the question. We're incapable of providing for the safety of not only the inmates and witnesses, but of jurors and witnesses in a public setting such as that.

On the morning of trial, defense counsel renewed a request that the trial court subpoena the victim's brother, Joseph Dunford. Counsel represented that this witness was needed to testify that Howard had no motive to kill the victim and that other people did have such a motive due to the victim's membership in a satanic cult. Howard's counsel stated that he had not spoken with the victim's brother. He also stated that the victim's brother had not been incarcerated with the victim during the months preceding the murder. The trial court denied Howard's request for this subpoena.

The Commonwealth presented evidence at trial showing that Joe Payne, an inmate at the Center, placed a lock on the victim's cell door, threw flammable liquid into the cell, and then ignited the liquid with a match. As a result, fire exploded from the cell. Seventy percent of the victim's body received second and third degree burns. Several days later, the victim died as a result of the burns and related complications.

The evidence further showed that Howard, Payne, and three other inmates planned the manner in which the victim would be killed. Howard procured a lock which was identified at trial as the one placed on the victim's cell door at the time of the burning. Howard was also assigned to be the "lookout" for Payne during the incident.

During presentation of the Commonwealth's evidence, the prosecutor repeatedly attempted to question his witnesses concerning their prior consistent statements, as well as their fears for their safety as a result of testifying at the trial. The trial court sus-

tained ten objections by defense counsel to this line of questioning. At one point during the presentation of the Commonwealth's case, Howard's counsel made a motion for a mistrial based on the improper questions asked by the prosecutor. The trial court did not rule on the motion, and counsel did not further request the court to do so at that time. A second mistrial motion reciting the same grounds was made at the conclusion of the Commonwealth's case. The trial court denied this motion.

As part of his case, the prosecutor also asked Dr. Marcella F. Fierro to "characterize for the jury the effect of second and third degree burns, specifically, in terms of any possible pain to the person." Howard objected to the relevance of the question. His objection was overruled. Dr. Fierro testified that second and third degree burns, such as those suffered by the victim, do not "totally involve nerve endings" and therefore do not "involve the most pain."

Another witness for the Commonwealth, inmate Robert Smith, testified that Howard had been involved in a similar murder at another prison. Smith stated that Howard told him:

And I remember he had told me before he got to State Farm how he burnt this black dude to death. And I was in the penitentiary then, and I had seen Steve Howard in this, but I didn't know how he did it. He told me he did it.

Howard objected to this testimony and requested that the evidence be struck. The record does not show that he asked for a mistrial at this point. The trial court ruled that the evidence was inadmissible, but stated that it would not grant a mistrial. Defense counsel stated: "Judge, I don't have any magic conclusions on how to handle it, and I'll leave it to your discretion."

The trial court then instructed the jury in the following manner:

Ladies and gentlemen, in answering the last question the witness went further than was responsive to the question, and I want you to disregard the last part of his answer. Anything he said following, "We're going to do him the same way we did the nigger in the penitentiary in '82." Disregard that. Do not consider anything that the witness said after that in an-

swering the question by Mr. Lewis.

Howard did not object to the trial court's instruction.

During closing argument in the case, the prosecutor commented on the danger faced by the Commonwealth's witnesses as a result of their testifying. Howard objected to the following portion of the prosecutor's argument:

It is against the code for one inmate to testify against another. We have got a murder case here where a man was brutally murdered because of drugs, and because of his homosexuality, was killed. Let me tell you, if you get killed for that, they would certainly get killed in this penal system for one man testifying against another.

The witnesses for the Commonwealth, ladies and gentlemen, you heard where they came from. Everyone of them from a different place, throughout the entire penal system, scattered throughout, hidden to keep them from being retaliated against, to keep them from being killed before the trial.

The trial court overruled Howard's objection to these comments, stating: "It is still fair argument based on the evidence. There was evidence that they were scattered out."

## II.

Howard argues that his right to a fair trial, encompassing the right to a presumption of innocence and an impartial jury, was violated by the location of his trial. He contends that because the administration building where the trial was held was within view of gun towers, bayonet wire, bars, and security fences, its environment was so prejudicial to him that no specific prejudice need be shown. *Estes v. Texas*, 381 U.S. 532, 542-43 (1965). Howard also argues that the seriousness of the crime and the length of the jury's deliberation (four hours), as well as his acquittal at this trial on a charge of first degree murder involving the same victim, all point to a conclusion that the jury was affected by the location of the trial.

In response, the Commonwealth argues that the location of the trial at the administration building was not inherently prejudicial. It argues that the jury would have heard that Howard was an inmate at Powhatan Correctional Center no matter where the trial was held. Further, it argues that the jury could have drawn several other inferences as to why the trial was being held at the administration building other than the inference that Howard was a particularly dangerous or culpable individual. Finally, the Commonwealth argues that because the administration building was separate from the prison proper and had a formal courtroom, Howard's rights were not violated.

■ The right of an accused to receive a fair trial is guaranteed by the sixth amendment and is secured to him against state infringement by the fourteenth amendment. *Drope v. Missouri*, 420 U.S. 162, 172 (1975); *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968). In reviewing Howard's claim that defects in the trial procedure resulted in the denial of a fair trial, we must examine the entire trial to determine whether he has been afforded the requisite due process. *See Estes v. Texas*, 381 U.S. at 543. In reviewing Howard's fair trial claim, we consider the location of the trial as well as his assertion that he was denied a fair trial by the manner in which the Commonwealth presented its evidence and argument.

The trial court originally agreed to hold Howard's trial at the Powhatan County courthouse. After learning that twenty-two inmate witnesses had been subpoenaed, however, the court decided to conduct the trial at the administration building located immediately outside the Correctional Center compound. The trial court based its decision on a factual finding that the courthouse personnel could not adequately provide for the safety of the inmates, witnesses, jurors, and the general public.

■ We examine the trial court's decision in accordance with the test set forth in *Holbrook v. Flynn*, 475 U.S. 560, (1986):

Whenever a courtroom arrangement is challenged as inherently prejudicial . . . the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether "an unacceptable risk is presented of impermissible factors coming into play."

*Id.* at 570 (quoting *Williams*, 425 U.S. at 505). In *Holbrook*, the accused challenged the trial court's decision to place four uniformed state troopers in the front row of the spectator's section of the courtroom in order to supplement existing courtroom security. The Supreme Court held that the presence of the troopers in the courtroom was not so inherently prejudicial as to deny the accused his constitutional right to a fair trial. The Court observed that jurors would not necessarily interpret the troopers' presence as a sign that the accused was a dangerous individual or guilty of the crime for which he was on trial. Rather, the Court found that the jurors could reasonably have concluded that the troopers were there to prevent any disruptions in the courtroom, regardless of their source. *Id.* at 569.

In the case before us, Howard claims that inherent prejudice resulted from the trial court's decision to locate the trial in the administration building. He relies on *State v. Lane*, 60 Ohio St. 2d 112, 397 N.E.2d 1338 (1979), in support of his contention that the trial location eroded the presumption of innocence due him.

█ The presumption of innocence afforded an accused is an integral component of his constitutional right to a fair trial. *Estelle v. Williams*, 425 U.S. 501, 503 (1976). "[O]ne accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978).

We find that the trial location did not erode Howard's right to a presumption of innocence. Initially, we reject his argument that *State v. Lane* is applicable to the facts presented here. In *Lane*, the court found that the defendants were denied a fair trial because they were tried in a makeshift courtroom located within the prison itself, where the jurors had a "constant view of the scene of the alleged offense [escape]." 60 Ohio St. 2d at 117, 397 N.E.2d at 1341-42. Further, the court found that the right of the defendant to call witnesses was chilled by the location of the trial and cited the fact that several inmate witnesses had refused to testify in the penitentiary courtroom for fear of reprisal by prison officials.

In contrast to the facts presented in *Lane*, the record before us shows that Howard was tried outside of the prison compound in a courtroom that "in all respects resemble[d] a courtroom." Further, the record contains no indication that the jurors could see the prison from the courtroom itself. Finally, no inmate witnesses refused to testify at the trial. For these reasons, we find that *Lane* is distinguishable from the case before us.

█ We further find that the location of Howard's trial in the administration building was not inherently prejudicial. The jury did not have to pass through gates or other security devices to reach the courtroom. The courtroom itself was not of a makeshift character. Since Howard was being tried for the murder of another inmate, the jury necessarily had to know that he was an inmate of the Powhatan Correctional Center. We find that the jury could reasonably have concluded that Howard's trial was being conducted in the administration building for reasons of efficiency and convenience. Many of the witnesses at the trial either worked at or were incarcerated in the adjacent Center. Therefore, we conclude that the location of Howard's trial did not impermissibly suggest that he was guilty of the offense for which he was being tried or otherwise operate to inherently prejudice him. *Holbrook*, 475 U.S. at 572.

We also reject Howard's claim that prejudice due to the trial location can be found from the seriousness of the crime and the four-hour time period that the jury deliberated, as well as the fact that he was acquitted in the same trial on the charge of first degree murder involving the same victim.

We next consider Howard's fair trial claim regarding the Commonwealth's evidence and argument. He raises three allegations of improper conduct by the prosecutor. First, he argues that the prosecutor repeatedly attempted to question his witnesses about their prior consistent statements and fears for their safety despite objections which were sustained by the trial court. Ten separate objections were raised by defense counsel on these subjects. At one point during the prosecutor's questioning, defense counsel made a motion for a mistrial. This was not addressed by the trial court, and counsel did not further request a ruling on that motion. At the conclusion of the Commonwealth's case, however, defense counsel made a second mistrial motion. The court overruled this motion, stating:

Certainly there were a lot of questions that I did find to be improper that were asked by the Commonwealth. And I did sustain a lot of objections that were made, but that's the purpose of objections and sustaining objections. I don't think that fact alone is grounds for a mistrial. So I would deny your motion to strike and motion for a mistrial.

In addressing this claim, we have examined the record and find that there was unwarranted, repetitive questioning by the prosecutor on subjects already ruled inadmissible by the trial court. However, while we believe that the prosecutor's conduct was improper, we do not find that it denied Howard a fair trial. Each time the prosecutor pursued an improper line of questioning, defense counsel's objections were sustained by the trial court. Further, in considering the mistrial motion, the trial court specifically determined that no prejudice had resulted from the prosecutor's manner of questioning. The trial court made this ruling based on its opportunity to observe the prosecutor's questioning and any prejudicial effect it may have had on the trial process. We find no basis on which to disturb the trial court's ruling.

We disagree with Howard that under the authority of *Boggs v. Commonwealth*, 199 Va. 478, 100 S.E.2d 766 (1957), prejudice is shown from the cumulative effect of the prosecutor's questions. During the course of the murder trial in *Boggs*, the prosecutor, after being admonished by the trial court, continued to ask improper questions concerning money carried by the deceased. The Supreme Court found that the prosecutor's continued questioning on this subject rendered the trial court's rulings ineffective. That questioning by the prosecutor, however, constituted only one of several factors which led the Court to conclude that Boggs had been prejudiced by the conduct of the trial. *Id.* at 487-88, 100 S.E.2d at 773.

In *Boggs*, the trial court erroneously admitted evidence of the accused's indictment for burglary and permitted a lengthy reading from the order of conviction showing that the accused had been convicted of assault and battery. The trial court later reversed itself and told the jury: "That goes out, gentlemen of the jury. You will disregard that." *Id.* The trial court also improperly admitted evidence that the deceased had a large amount of money on him the evening prior to his death, but had little money on him the

next day when examined by the mortician. Part of this evidence was later struck by the trial court. Finally, the trial court in *Boggs* erred when it admitted into evidence a protracted account of the accused's misconduct toward his wife, who was the sister of the deceased. *Id.* at 487, 100 S.E.2d at 772-73.

The Supreme Court found that prejudice resulted from the cumulative effect of these errors. However, most of the errors leading to this finding of cumulative prejudice resulted from the trial court erroneously allowing several types of prejudicial evidence to be considered by the jury, then striking a portion, but leaving much of it remaining in evidence. In contrast, the record before us shows that the trial court sustained all of Howard's objections to the prosecutor's questions on the subjects of the witnesses' fear and prior consistent statements. None of the evidence improperly sought by the prosecutor on those subjects was admitted. Therefore, in the case before us, we find that the cumulative prejudice analysis of *Boggs* is not applicable to the issue of the prosecutor's questions.

Howard's next fair trial claim attacks a portion of the prosecutor's closing argument which the trial court allowed over his objection. The prosecutor argued that in the penitentiary it is against "the code" for one inmate to testify against another, and suggested that an inmate who does testify would be killed. The prosecutor also stated that the Commonwealth's inmate witnesses were hidden throughout the penal system to keep them from being killed before the trial. The trial court overruled Howard's objection to this argument, stating that it was proper since evidence was presented that the witnesses were "scattered out."

Defense counsel agreed that there was evidence that the inmates were "scattered out" in the system. Moreover, defense counsel himself elicited evidence from inmate Smith that he took "a chance on getting killed for being a snitch." In response to further questioning by defense counsel, Smith testified that he received a letter containing a death threat from someone who thought he had talked to the police. Defense counsel also asked inmate Miller whether Investigator Stokes told him that he would be a "dead man" if he was put back in the general prison population after cooperating with the investigation. Miller answered in the affirmative.

██ From this evidence in the record, resulting in large part from defense counsel's questions, we find sufficient basis for the prosecutor's closing argument. We disagree with Howard's claim that the prosecutor's remarks directly suggested that Howard would have killed the witnesses. The prosecutor's remark alluded to the inmate population in general and its "code" of conduct. He was entitled to argue inferences and conclusions which could be drawn from the testimony elicited on this subject. *Artis v. Commonwealth*, 213 Va. 220, 227, 191 S.E.2d 190, 195 (1972). Therefore, we reject Howard's claim that he was denied a fair trial by the content of the prosecutor's closing argument.

Third, Howard argues that he was denied a fair trial by the court's failure to grant a mistrial when R. F. Smith, one of the Commonwealth's witnesses, testified that Howard told him he had murdered an inmate at another penitentiary in a similar manner. The testimony in question arose during Smith's description of the murder conspiracy. Smith testified:

Steve Howard said they couldn't get both of them, but both of them needed to die. So they will get the one that's here now. He went on with the method. A gallon can, a paint can, and it was full of liquid. It's hard to explain what the liquid looked like. It was ethyl, or whatever. You could smell the fumes coming off of it. He is going to do this guy the same way he did that nigger in the penitentiary in '82. And I remember he had told me before he got to State Farm how he burnt this black dude to death. And I was in the penitentiary then, and I had seen Steve Howard in this, but I didn't know he did it. He told me he did it.

Defense counsel did not object until after Smith had completed this entire statement. The trial court indicated that it expected an earlier objection. Apparently, the court had already ruled that the portion of the conversation between Howard and Smith which occurred before they came to Powhatan was inadmissible. The trial court affirmed this prior ruling and sustained Howard's objection. It then stated *sua sponte* that it would not grant a mistrial. Defense counsel replied: "Judge, I don't have any magic conclusions on how to handle it, and I'll leave it to your discretion." At this point, the trial court instructed the jury to disregard anything Smith said after the statement: "He is going to do this guy the

same way he did that nigger in the penitentiary in '82." Howard did not object to the substance of the court's instruction.

We find that since Howard's counsel left the manner of corrective action to the trial court's discretion, and did not offer objection to the court's instruction or request other action at this time, he waived any further objection to the trial court's handling of Smith's remarks. Also, since there is an absence of evidence to the contrary, we presume that the jury followed the trial court's instruction to disregard the testimony in question. *LeVasseur v. Commonwealth*, 225 Va. 564, 589, 304 S.E.2d 644, 657 (1983), *cert. denied*, 464 U.S. 1063 (1984).

In summary of Howard's fair trial claim, therefore, we have examined the record and find that each of his allegations is without merit.

## III.

Howard next argues that the trial court denied him his sixth amendment right to compulsory process when it refused to issue a subpoena for Joseph Dunford, the victim's brother. Howard wished to call Dunford to testify that Howard had no motive to kill the victim, but that other people did because of the victim's membership in a satanic cult. Defense counsel had not spoken with Dunford and informed the trial court that Dunford had not been incarcerated with the victim at the Center during the months immediately preceding the murder.

The sixth amendment does not guarantee an accused the right to compel the attendance of any and all witnesses. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). In order to assert his right to compulsory process, the accused is required to make a plausible showing that the testimony sought would be both material and favorable to his defense. *Id.* at 867.

We find that Howard failed to meet this test. He did not make a plausible showing of materiality. His counsel had not spoken with Dunford and, therefore, could only speculate as to what he might say. Further, Dunford was an inmate in another penitentiary during the months leading up to the murder. Thus, there was no showing that he had any knowledge bearing on his brother's relationship with Howard immediately preceding the murder. The

fact that other people may have wanted to kill the victim because he was involved in a satanic cult did not tend to exculpate Howard in any manner. Since counsel could only speculate as to what Joseph Dunford would say and since Joseph Dunford was not present at the time of the alleged offenses, Howard also failed to make a plausible showing that Joseph Dunford's testimony would be favorable to his defense. Therefore, because Howard failed to make the dual showing that Dunford's testimony would be both material and favorable to his defense, as required by *Valenzuela-Bernal*, we reject his claim that he was denied his sixth amendment right to compulsory process.

## IV.

We turn now to Howard's contention that the trial court erred in admitting evidence of pain suffered by the victim. Medical Examiner Marcella F. Fierro testified that the victim sustained burns over seventy percent of his body. She stated that "a lot" of these burns were of second and third degree. During his direct examination, the prosecutor asked Fierro to describe the effect of second and third degree burns, specifically, in terms of any possible pain a person would suffer. Howard objected to the relevance of this inquiry. The trial court overruled his objection. Fierro responded:

Burns are classified by the amount of skin damage they do. Second degree is reddened. Third degree is upper layers of the skin, but leaves nerve endings and hair follicles, and sweat glands intact. Third degree burns extend down into that area removing nerve endings and causing soreness, so that you have a situation where the more severe the burn, the less the burn. Second degree burn and third degree burn, that doesn't totally involve nerve endings. It doesn't involve the most pain. He had a lot of second and third degree burns.

Howard argues that this evidence of the victim's pain, and argument based on this evidence, was irrelevant and inflammatory. He argues that its admission cannot be considered harmless error.

The Commonwealth argues that evidence of pain was relevant to the issue of malice. Further, it argues that this evidence did not prejudice Howard since Dr. Fierro stated that second and third

degree burns involve a lesser amount of pain. The Commonwealth further notes that defense counsel elicited far more graphic evidence of the victim's pain through the testimony of defense witness Jesse Pritchard who described the victim's hands as "burned down to the bone [so that] you could see the bone coming through, when they had to pry his fingers off the bars." Finally, the Commonwealth notes that Howard did not timely object to the prosecutor's comment on the victim's agony made during closing argument.

We agree with Howard that the amount of pain suffered by the victim is irrelevant to malice or any other element of either offense charged. We find, however, that admission of this evidence was harmless error. Dr. Fierro did not testify that the victim suffered great pain or agony. Rather, she testified that second and third degree burns result in less pain sensation due to nerve ending damage. Therefore, we find that although it was irrelevant to any element of the crimes charged, Dr. Fierro's testimony regarding pain was not inflammatory in nature. We further note that Howard's own witness, Jesse Pritchard, gave far more graphic testimony when he described the appearance of Howard's hands when they were pried loose from the bars of his cell. Considering these facts in the further context of the clear and compelling evidence of Howard's guilt, we find that the erroneous admission of Dr. Fierro's testimony regarding pain was harmless error. *Rozier v. Commonwealth*, 219 Va. 525, 528, 248 S.E.2d 789, 791 (1978). We do not consider Howard's claim that the prosecutor's reference to the victim's pain during closing argument was inflammatory and prejudicial because he failed to raise this objection in the trial court. Rule 5A:18.

In summary, we find that Howard was not denied a fair trial due to its location in the administration building of the Powhatan Correctional Center, nor was he denied a fair trial as a result of the Commonwealth's presentation of evidence and argument. We further find that he was not denied his sixth amendment right to compulsory process when the trial court refused to subpoena the victim's brother, and that while the trial court erred in allowing testimony regarding pain suffered by the victim, its error was

harmless. Accordingly, we affirm Howard's conviction.

*Affirmed.*

Cole, J., concurred.

Benton, J., dissenting.

I respectfully dissent from that portion of the opinion which holds that testimony attributing to the defendant a murder, unrelated to the charge for which he was being tried, was not ground for a mistrial. I would hold that defense counsel's objection to the testimony was not waived and that the judge's admonition to the jury to disregard the testimony was insufficient to overcome the highly prejudicial effect of the testimony.

Although the record is unclear as to the precise ruling of the judge prior to trial, he apparently ruled admissible, over defense counsel's objection, a conversation between the defendant and R. F. Smith, a witness for the Commonwealth, which was alleged to have occurred at the State Farm sometime before the murder for which the defendant was being tried. The conversation was alleged to have concerned the planning of the murder for which the defendant was being tried. Smith testified, in part, on direct examination by the Commonwealth as follows:

MR. SMITH: * * * Steve Howard said they couldn't get both of them, but both of them needed to die. So they will get the one that's here now. He went on with the method. A gallon can, a paint can, and it was full of liquid. It's hard to explain what the liquid looked like. It was ethyl, or whatever. You could smell the fumes coming off of it. He is going to do this guy the same way he did that nigger in the penitentiary in '82. And I remember he had told me before he got to State Farm how he burnt this black dude to death. And I was in the penitentiary then, and I had seen Steve Howard in this, but I didn't know he did it. He told me he did it.

MR. ZERKIN: I'm going to object to that, and I move to strike the testimony and ask that it be struck. I think we should go further into it outside of the presence of the jury.

The trial judge sustained defense counsel's objection and stated that the testimony "was not . . . contemplated" when he made his pre-trial ruling. The record does not reflect that the trial judge or defense counsel knew in advance the particulars of the objectionable testimony. Smith was the Commonwealth's witness and he was testifying on direct examination when the error occurred. Moreover, the Commonwealth was apprised of the judge's pre-trial ruling and, significantly, did not assert in the trial court or in this Court that the witness' testimony was unexpected. We cannot determine from the record whether the Commonwealth informed its witness of the pre-trial ruling. In any event, the objection by defense counsel was raised in a matter of seconds after the inadmissible statements and was timely. *See Caldwell v. Commonwealth*, 221 Va. 291, 295-96, 269 S.E.2d 811, 814 (1980)(objection to the reading of irrelevant portions of a statute did not come too late when made as soon as the clerk completed the reading).

After sustaining defense counsel's objection, the trial judge *sua sponte* refused a mistrial and decided instead to merely admonish the jury to disregard the last part of Smith's testimony. The majority holds that after raising objection to Smith's testimony, the defendant has nonetheless waived his right to a mistrial and waived any objection to the trial judge's cautionary instruction because defense counsel "did not offer objection to the court's instruction or request further action." I find no indication from the record or the law that defense counsel waived objection to the trial judge's handling of Smith's remarks.

After affirming defense counsel's objection, the trial judge stated: "I'm going to tell the jury to disregard it. I know the problems with it, but I'm not going to declare a mistrial." Since the judge's ruling precluded defense counsel from the opportunity of requesting a ruling on a mistrial and since formal exceptions are no longer necessary in our courts, the absence of an objection cannot now be taken as a waiver of defendant's entitlement to appeal the denial of a mistrial. *See* Code § 8.01-384(A).

Even if the trial court had not ruled *sua sponte* that a mistrial would not be granted, defense counsel's initial objection to Smith's testimony would preserve defendant's right to appeal and is not waived by the absence of a request for a mistrial. "The failure to make a motion for a new trial in any case in which an appeal [or] writ of error . . . lies to or from a higher court shall not be

deemed a waiver of any objection made during the trial if such objection be properly made a part of the record." Code § 8.01-384(B); *see also Harrison v. Commonwealth*, 183 Va. 394, 32 S.E.2d 136 (1944)(new trial granted to prevent injustice even though no exception was taken to court's ruling after defendant's objection); *Boggs v. Commonwealth*, 199 Va. 478, 100 S.E.2d 766 (1957)(new trial granted to prevent injustice despite the fact that no motion was made for a mistrial after defense counsel stated objections).

Additionally, the lack of objection to the trial judge's phraseology of the cautionary instruction cannot be deemed a waiver of defendant's right to appeal this ruling.

> The rule in Virginia is well established that a judgment will not be reversed for the admission of evidence which the court afterwards directs the jury to disregard unless there is a manifest probability that the evidence has been prejudicial to the adverse party. The exception to this rule is that the admission of incompetent evidence is reversible error notwithstanding the fact that the trial court, after its admission, instructed the jury to disregard it, if such illegal evidence was so impressive that it probably remained on the minds of the jury and influenced their verdict.

*Ashbury v. Commonwealth*, 211 Va. 101, 104, 175 S.E.2d 239, 241 (1970)(citations omitted). "There are cases in which the error of admitting improper testimony . . . cannot be adequately overcome by a subsequent direction to the jury to disregard the objectionable evidence or statements." *Washington and Old Dominion Railway v. Ward's Adm'r.*, 119 Va. 334, 339, 89 S.E. 140, 142 (1916). This is such a case. Here the error was so great and the testimony was so damaging that the trial judge's instruction to the jury to disregard the last part of Smith's testimony was insufficient to overcome the highly prejudicial effect of testimony informing the jury that the defendant committed a prior murder.

Absent well established exceptions, none of which are present in this case, evidence that a defendant has committed crimes other than the offense for which he is then being tried is inadmissible. *See Lewis v. Commonwealth*, 225 Va. 497, 502, 303 S.E.2d 890, 892-93 (1983); *King v. Commonwealth*, 217 Va. 912, 914, 234

S.E.2d 67, 69 (1977). The rationale behind the general rule of inadmissibility of prior crimes is that "such evidence confuses one offense with the other, unfairly surprises the defendant with a charge he is unprepared to meet, and, by showing that the [defendant] has a criminal propensity, tends to reverse his presumption of innocence of the crime on trial." *Lewis*, 225 Va. at 502, 303 S.E.2d at 893.

Citing *LeVasseur v. Commonwealth*, 225 Va. 564, 304 S.E.2d 644 (1983), *cert. denied*, 464 U.S. 1063 (1984), the majority presumes that the jury obeyed the trial judge's cautionary instruction. Such a presumption is unwarranted under the circumstances found here. Unlike *LeVasseur*, where the Commonwealth on cross examination asked an improper question to a defendant who "had, in effect, admitted" committing a murder, the testimony in this case imputing to the defendant an admission of having committed a prior murder would not "pale into relative insignificance" when compared with other evidence proved at trial. *Id.* at 589, 304 S.E.2d at 657. In this case the defendant took the stand in his own defense and denied having been involved in the murder for which he was being tried. The defendant apparently was never charged and tried for committing the prior murder. Moreover, the unexpected testimony deprived the defendant of the opportunity to put on evidence, as related by defense counsel to the trial judge, that an eyewitness to the prior murder exonerated the defendant.

It is manifestly probable that, despite the judge's admonition to the jury, the improper testimony indelibly exposed the jury to evidence that (1) inexorably linked the prior murder to the defendant and to the offenses being tried, and (2) tended to prove that the defendant had a propensity to commit murder. The error in this case undoubtedly reversed the presumption of innocence. No amount of warning could have conveyed to the jury the gross impropriety of the testimony. No instruction could have accomplished the subtle feat of erasing evidence of the previous murder from the minds and memories of the ordinary citizens sitting to consider whether the defendant was a murderer. No caution to the jury could have effectively restored the balance to afford the defendant a fair trial. Defense counsel correctly concluded that a cautionary instruction would have been woefully inadequate and could not have cured the prejudice.

For these reasons I conclude that the impropriety was manifestly prejudicial and that the trial court erred in refusing a mistrial. Accordingly, I would reverse and remand for a new trial.