# Richmond

## Edward B. McLane v. Commonwealth of Virginia.

October 10, 1960.

Record No. 5106.

Present, All the Justices.

The opinion states the case.

*Paul Whitehead* (*J. Frank Shepherd*, on brief), for the plaintiff in error.

*R. D. McIlwaine, III, Assistant Attorney General* (*A. S. Harrison, Jr., Attorney General*, on brief), for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

Edward B. McLane, sometimes hereinafter referred to as defendant, was indicted for the first degree murder of Pelham Lewis Weakley, Jr. Upon his trial, he was convicted by a jury of murder in the second degree, his punishment fixed at ten years in the penitentiary, and he was sentenced accordingly.

McLane perfected this appeal and contends:

(1) That the trial court erred in its refusal to grant his motion for a mistrial, made when he was asked on cross-examination whether or not he had previously been convicted of a felony;

(2) That the court erred in not sustaining his objection to improper argument of the Attorney for the Commonwealth; and

(3) That the court erred in refusing to set aside the verdict of the jury because there was conclusive evidence that he was controlled by an irresistible impulse, arising from a diseased mind, at the time of the alleged offense.

The dominant issue in the case was the mental condition of the defendant prior to and at the time of the killing. However, in order to understand defendant's several contentions, it is necessary to state the evidence and incidents of the trial pertinent thereto.

On April 20, 1959, McLane shot and killed Weakley on Main street, in Lynchburg, Virginia. McLane, a barber, lived with his wife and three children in Madison Heights, near Lynchburg. His wife, Betty McLane, was employed at a manufacturing plant, and while working there she became acquainted with Weakley, a fellow

employee, and a married man. Their acquaintance resulted in an immoral and illicit sexual relationship.

On January 27, 1959, nearly three months before the killing, Mrs. McLane and Weakley left Lynchburg and went to Baltimore, Maryland, and Arlington, Virginia, where they lived together several days as man and wife. On January 31, 1959, Weakley abandoned Mrs. McLane in Charlottesville, Virginia, and returned to Lynchburg. McLane went to see Weakley about the whereabouts of the former's wife, and Weakley denied any knowledge of where she was. McLane told Weakley to remain out of his family affairs. Thereafter, Mrs. McLane called her husband from Charlottesville. He went there on February 7, 1959, and they returned to their home in Madison Heights. Mrs. McLane related to her husband the details of her illicit relations with Weakley. A reconciliation was effected between Mr. and Mrs. McLane, and they reaffirmed their marriage vows by going through another marriage ceremony.

There was no communication between the McLanes and Weakley until April 20, 1959, the day of the shooting. On that day, the defendant left his barber shop and returned to his home for lunch. His wife then told him that Weakley had been to their home in the morning of that day; that while she was hanging her laundry in the yard, Weakley stopped his car, called to her and requested that she "go stepping" with him; that she refused the invitation, told Weakley to go away and leave her alone, and that she would tell her husband; and that Weakley replied that he was not afraid of anything her husband might do. Upon hearing this, McLane became upset, and returned to his barber shop. While driving back to his shop, he picked up three truant school boys, and they said he told them that if he saw the "right man" in town he was going to kill him. About 3:00 p. m., while engaged in cutting the hair of one of his customers, McLane said that he looked out of the front door of the barber shop, and saw Weakley standing on the sidewalk, across the street, staring and scowling at him. He obtained a pistol from a cabinet in the shop, went out of the front door to an automobile in which Weakley was seated, and opened fire on him. Weakley got out of the automobile and undertook to run away. McLane fired several shots at Weakley, hitting him four times, and Weakley fell dead on the street. McLane then came up to him, grabbed him, tore his shirt, and said: "God damn you, you son of a bitch, this is what you deserve."

McLane walked back to the barber shop, threw his pistol against the right door of Weakley's automobile, breaking the glass, then picked up the pistol, went into the barber shop, laid it down, got in his automobile, and drove to police headquarters. There he made, at different times, somewhat different statements.

Witnesses to the shooting testified as to the conduct, appearance, and behavior of McLane at that time and subsequent thereto. Police officers testified as to statements made to them by the defendant after the shooting, and as to his appearance and behavior at that time. McLane said that he did not remember some of the details referred to.

Dr. John O. Hurt, fifty-two years of age, testified that he had practiced his profession since 1946, in the vicinity of Roanoke, Virginia, with his office in the nearby town of Vinton. He said that he graduated as a Doctor of Medicine from the University of Virginia in 1934; that he had since specialized in "neurology and psychiatry, diseases of the nervous system;" had served a psychiatric internship at Western State Hospital, a state mental hospital, for three and one-half years and was on the staff for one year; that he was at DeJarnette's Sanatorium as resident physician eighteen months, and then clinical director of psychiatry at Lynchburg State Colony for about three and one-half years; that he then went into the United States Army; and that he was Chief of the Neuro-Psychiatric Service in California and the South Pacific for about four and one-half years, becoming Chief of the Psychiatric Staff in several Army hospitals during World War II. He first saw the defendant in his office on May 21, 1959, and then gave him an examination.

Asked a hypothetical question which summarized the evidence presented on behalf of the defendant and his witnesses, Dr. Hurt testified that, in his opinion, McLane had a diseased mind at the time he shot Weakley; that he had suffered mental stress from January to May; that his mental disease "caused the reaction of which he had no conscious control at that time;" and that when McLane gave himself up to the police, he was "in a state of profound mental shock and confusion," and probably had no recollection of what took place.

It appeared that, at the commencement of the trial, when counsel were requested to list the names of their witnesses, have them brought forward to be sworn, and then removed from the courtroom until the time for them to testify, the name of Dr. Hurt was not mentioned. No objections were noted to the qualifications of the doctor as a medical expert.

During the progress of the trial, the Commonwealth's Attorney, in cross-examining the defendant, asked him the following question: "I believe on a prior occasion you were convicted in the Circuit Court of Campbell County for malicious wounding, were you not?" Counsel for defendant promptly objected. The jury retired from the courtroom, and upon investigation it was disclosed that McLane had been indicted in Campbell County for malicious wounding, a felony, but that he had pleaded guilty only to assault and battery, a misdemeanor; that he had been convicted on November 14, 1955, of the misdemeanor and sentenced to serve a year in jail and to pay a fine of $50.00. It was ordered that the sentence be suspended, upon payment of the fine and costs, and McLane be placed upon probation for three years.

The trial court asked the Commonwealth's Attorney if he wished to withdraw the question. Whereupon, the Commonwealth's Attorney said he would like to withdraw it, stating that he had been misinformed by a probation and parole officer. The jury was then returned to the courtroom, and the court gave them the following instruction:

"Gentlemen of the jury, since you retired Mr. Jester has investigated further and has asked the court leave to withdraw the question he asked the prisoner about whether he had been previously convicted of a felony so the court grants to Mr. Jester the right to withdraw that question. Now, of course, you will treat it as if that question had never been asked and in no way make any .......... whatever to the question or what the answer might have been, just completely disregard the question and all effects of such question."

"You may proceed with the case."

Defendant then requested permission to make a further motion "in the absence of the jury." The jury left the courtroom, and defendant moved for a mistrial on the ground that the question asked by the Commonwealth's Attorney was prejudicial, since it was not based on the facts and left an impression on the minds of the members of the jury, which could not be wiped out by allowing the Commonwealth's Attorney to withdraw the question. The court overruled the motion, and counsel promptly noted an exception to the ruling.

In his closing argument, the Attorney for the Commonwealth made the following statement:

"Now, the sole issue that has been thrown into your lap was

what was his mental condition at the time. Now, the defendant, when he called his witnesses on yesterday and the court instructed both counsel for the Commonwealth and counsel for the defendant to read out the names of the witnesses and have them brought forward to be sworn and taken out of the court room, there was a notorious conspicuousness in the absence of the name of John O. Hurt, known as 'Dr. Hurt.' No mention was made of his name at that time. No mention was made of his name at any time during the trial of this case until this morning, as a last witness for the defendant when the Commonwealth had absolutely no opportunity to send out and bring in an alienist, a competent alienist, a man who knows something about this kind of a condition, to testify before you.

"Now, what do we find about this man, John Hurt? He poses from the vicinity of Big Lick. Mr. Whitehead, in his first question, asked 'Do you practice in the vicinity of Roanoke?' Apparently he was ashamed to ask him if he was from the little village of Vinton. He is a man who never interned for one minute after graduating from medical school in 1934, a man who had never had an opportunity to have any real sure enough experience in this field. He said 'I worked at DeJarnette's awhile, I worked at Western State Hospital, I worked over here at the Colony, and I was in the Army for a while and since then I have been practicing my profession in Vinton.'

"I say to you, my friends of the jury, these twelve men representing fifty-odd thousand people of Lynchburg, you know you can go to your classified section in the telephone directory and open it up and the names of some seventy or more physicians will unfurl themselves to you, among them being Dr. Bennie Arnold, the man who was formerly Superintendent of the hospital right across the river. Why didn't they bring him here if they wanted somebody who really knows their business? Why didn't they bring Nagler here who is the present Superintendent of that hospital?"

"Mr. Whitehead: If your Honor please, I want to object to this type of argument. He argued first he had no chance to get a doctor here. There is no evidence he asked the court for any delay, and furthermore this evidence shows here unquestionably that this doctor is competent, and because I didn't bring some other doctor he certainly should not prejudice this defendant.

"The Court: I think the argument is within due bounds. He has a

right to comment on local conditions known to everybody. He has a right to comment on the fact that the name of this doctor was never called in court and that there was no evidence that he was ever advised that that point would be made or that any physician would testify. I think he is within due bounds to comment on those facts. I overrule your objection.

"Mr. Whitehead: We want to note an exception, if your Honor please, on the ground, of course, that there is no duty upon the defense to tell the Commonwealth what its defense will be.

"The Court: It is not a question of any duty but a question of the Commonwealth not knowing.

"Mr. Jester: You see what happens when you start getting under his skin * * *."

Upon return of the verdict finding defendant guilty, the court overruled a motion that it be set aside as contrary to the evidence, and for the refusal of the court to order a mistrial because of improper conduct of the Commonwealth's Attorney.

■ McLane had not been convicted of a felony, nor upon a charge involving moral turpitude. It was improper for the Attorney for the Commonwealth to ask him if he had been convicted of a felony, and it was further improper to preface the question with the personal belief of the interrogator. Code, 1950, § 19-239, 1960 Cumulative Supplement § 19.1-265 provides that:

"Conviction of felony or perjury shall not render the convict incompetent to testify, but the fact of conviction may be shown in evidence to affect his credit."

It has long been well settled in this State that the character of a witness for veracity cannot be impeached by proof of a prior conviction of crime, unless the crime be a felony, or one which involved moral turpitude or the character of the witness for veracity. *Harold* v. *Commonwealth*, 147 Va. 617, 622, 136 S. E. 658; *Smith* v. *Commonwealth*, 155 Va. 1111, 1121, 156 S. E. 577; *Bell* v. *Commonwealth*, 167 Va. 526, 537, 189 S. E. 441; *Bland* v. *Commonwealth*, 177 Va. 819, 823, 13 S. E. 2d 317; *Taylor* v. *Commonwealth*, 180 Va. 413, 417, 23 S. E. 2d 139; *C. & O. Ry. Co.* v. *Hanes, Adm'r*, 196 Va. 806, 813, 86 S. E. 2d 122; Annotation 161 A. L. R. 233.

No improper testimony was admitted in response to the question of the Commonwealth's Attorney, and the court took prompt, direct and positive action in instructing the jury to disregard the question

and all of its effects. There appears no manifest probability that the question was prejudicial to the defendant, in view of the trial court's action. While we do not condone the improper action of the Commonwealth's Attorney in framing and asking the question, we find no reason for holding that defendant was prejudiced thereby. *Trout* v. *Commonwealth*, 167 Va. 511, 188 S. E. 219; *McLean* v. *Commonwealth*, 186 Va. 398, 43 S. E. 2d 45; and *Royals* v. *Commonwealth*, 198 Va. 883, 96 S. E. 2d 816.

The protest against the court's action in overruling defendant's objection to the hereinbefore quoted portion of the Commonwealth Attorney's argument presents a more serious situation. The Commonwealth's Attorney first chided the defendant on his failure to disclose, at the commencement of the trial, the name of Dr. Hurt as a defense witness. He then complained that he had no opportunity to send out and bring in an alienist, "a competent alienist, a man who knows something about this kind of a condition, to testify before you." He then proceeded to belittle Dr. Hurt, his residence, and his experience as a medical man. He referred to the classified section of the Lynchburg telephone directory, and the listing of numerous physicians therein, naming several whom he said "really know their business." In effect, the Commonwealth's Attorney charged that Dr. Hurt lacked experience, competence, and trustworthiness. He implied that other physicians better qualified would have testified differently than did Dr. Hurt.

In the first place, there was no duty upon defendant to inform the Commonwealth's Attorney of the evidence which he would offer in his defense, [nor to inform the Commonwealth's Attorney of the names of his witnesses who would be called to testify on his behalf.] The Commonwealth's Attorney did not ask for a delay or for leave to summon an alienist to testify on behalf of the Commonwealth. No exceptions were noted to the qualifications of Dr. Hurt as a medical expert, when he was sworn in as a witness. There was no evidence with reference to the telephone directory of the city of Lynchburg and the names of the doctors listed therein. The attack upon the competence and reliability of Dr. Hurt and the remark that the argument was "getting under the skin" of defendant's counsel were sufficient to divert the jurors' attention from the main issue, arouse their resentment over the conduct of defendant's counsel, and prompt them to give unwarranted effect to issues and evidence not before them.

Moreover, the remarks of the court upon overruling the objection of the defendant were calculated to leave the jury under the impression that it was the duty of the defendant to disclose his defense and names of his witnesses to the Commonwealth's Attorney before the trial; and that defendant had been guilty of wrongdoing in failing to do so. They served to approve and strengthen the improper argument and thereby had a natural and normal tendency to show that the views of the Commonwealth's Attorney were shared by the court. *Skipper* v. *Commonwealth*, 195 Va. 870, 879, 80 S. E. 2d 401; and *Boggs* v. *Commonwealth*, 199 Va. 478, 487, 488, 100 S. E. 2d 766. Counsel for the defendant was not on trial, and, in making objections to the argument of the Commonwealth's Attorney, he was not properly subject to criticism.

The making of improper statements in argument is reversible error, where such statements are so impressive as to remain in the minds of the jurors and influence their verdict. *Coffey* v. *Commonwealth*, 188 Va. 629, 51 S. E. 2d 215.

We have repeatedly held that Attorneys for the Commonwealth are not only under the duty to prosecute one charged with crime; but also under the duty to see that the accused gets a fair and impartial trial. Nothing should be done or permitted to prejudice the case of an accused, or obscure the minds of the jurors on the question of whether or not he is guilty of the offense charged. *Parsons* v. *Commonwealth*, 138 Va. 764, 784, 121 S. E. 68; *Taylor* v. *Commonwealth*, 180 Va. 413, 23 S. E. 2d 139; *Bateman* v. *Commonwealth*, 183 Va. 253, 256, 32 S. E. 2d 134; *Harrison* v. *Commonwealth*, 183 Va. 394, 402, 32 S. E. 2d 136; *Compton* v. *Commonwealth*, 190 Va. 48, 55 S. E. 2d 446. Cf. *Harris* v. *Commonwealth*, 133 Va. 700, 708, 112 S. E. 753.

We find no merit in defendant's third contention that the trial court erred in permitting the jury to pass upon the question of whether or not the defendant was controlled by an irresistible impulse, arising from a diseased mind, at the time of the slaying.

The evidence was in conflict as to the actions, conduct, appearance, and behavior of McLane prior to, at the time of, and subsequent to the slaying. It was for the jury to say, upon a careful consideration of all the evidence, whether or not the defendant was mentally irresponsible at the time of the alleged offense. The jurors were not required to accept the testimony of Dr. Hurt as conclusive merely

because he qualified as a medical expert. The evidence of an expert witness should be given the same consideration as is given that of any other witness, considering his opportunity for knowledge of the subject and subject matter as to which he testifies, his appearance, conduct, and demeanor on the stand. *Wessells* v. *Commonwealth*, 164 Va. 664, 671, 180 S. E. 419; *Thompson* v. *Commonwealth*, 193 Va. 704, 712, 70 S. E. 2d 284.

In *Thompson* v. *Commonwealth*, 193 Va., *supra*, at pages 717 and 718, we approved a comprehensive definition of "irresistible impulse," and said:

"The irresistible impulse doctrine is applicable only to that class of cases where the accused is able to understand the nature and consequences of his act and knows it is wrong, but his mind has become so impaired by disease that he is totally deprived of the mental power to control or restrain his act."

The jury was fully and clearly instructed upon the question of irresistible impulse, and no objections to such instructions were made by the defendant.

The harmful consequences of the prejudicial argument of the Commonwealth's Attorney prevented the defendant from having that character of a fair and impartial trial to which he is entitled. For that reason, the judgment complained of is reversed and a new trial ordered.

*Reversed and remanded.*