**Richmond**

RONNIE GODLEY

v.

COMMONWEALTH OF VIRGINIA

No. 0143-84

Decided May 6, 1986

COUNSEL

Sa'ad El-Amin (David R. Lett; Sa'ad El-Amin & Associates, on brief), for appellant.

Thomas C. Daniel (Gerald L. Baliles, Attorney General of Virginia, on brief), for appellee.

OPINION

**BARROW, J.**—This appeal of a second degree murder conviction challenges (1) the failure of the trial court, hearing the case without a jury, to find the defendant not guilty based upon the defense of irresistible impulse and (2) the sufficiency of the evidence on the issue of malice. We conclude that the evidence supported the trial court's decision that the defendant's act was not excused because of an irresistible impulse and that the evidence of malice was sufficient to sustain the conviction. For these reasons, we affirm.

Godley shot and killed his girlfriend at her place of employment. She was walking across a parking lot when the defendant drove up, got out of his automobile, struck her and shot her with a pistol he was carrying. He walked into the plant and told a worker to call the police because he had just killed his "old lady." He returned to the parking lot and placed a blanket under his girlfriend's head. When the police arrived he was standing in the parking lot and admitted, "I shot her."

Since petitioner did not testify, the only explanation of his conduct was revealed by what he told a psychiatrist after the shooting. He said that, when he realized his girlfriend had surreptitiously left him, he went to her place of employment to find her. An argument ensued, and she confronted him with the revelation that her child, whom he thought he was the father of, was not his. At that point he "hit her with a gun that he had in his hand, grabbed her, pulled her and she tried to pull away and then . . . the gun fired."

Approximately one month prior to the shooting Godley obtained treatment from a clinical psychologist who saw him on four occasions before the shooting occurred. This psychologist testified that Godley had a "borderline personality disorder" and was "prone to trouble with impulse control." When asked if Godley "could control the impulse," he responded, "I am not clear on that because I wasn't present at the time." The psychiatrist who saw Godley after the shooting testified that when Godley shot his girlfriend

there was nothing "that made him more unable to resist that impulse than at other times, except for the extremity of the emotional situation."

Godley argues that questions directed by the trial judge to the psychiatrist and psychologist reveal a lack of understanding by the judge that undermines the validity of his determination that Godley did not kill while under the influence of an irresistible impulse. But, if the trial judge's questions imply a lack of understanding, the responses to his questions presumably corrected any misunderstanding he may have had. Thus, we cannot conclude simply from the trial court's questions that his decision after hearing the testimony was based on a lack of understanding.

Godley also contends that the trial judge's comments indicate that he assumed the defendant was angry and that his anger was that of a normal individual confronted with the same circumstances. This conclusion, however, was one the trial judge could have reached, and apparently did reach, based on the evidence.

The psychiatric testimony was inconclusive on the issue of irresistible impulse. This defense is applicable only where the accused's mind has become "so impaired by disease that he is totally deprived of the mental power to control or restrain his act." *Thompson* v. *Commonwealth*, 193 Va. 704, 718, 70 S.E.2d 284, 292 (1952). Although Godley may have had "trouble with impulse, control," neither psychiatrist testified that he was "totally deprived of the mental power to control or restrain" himself from shooting his girlfriend. Even if one of them had, the trial court was not required to accept the experts' opinions as conclusive. *McLane* v. *Commonwealth*, 202 Va. 197, 205-06, 116 S.E.2d 274, 281 (1960).

Those who saw Godley at the time of the slaying described his behavior which reflected his state of mind. His "actions, conduct, appearance and behavior . . . prior to, at the time of, and subsequent to the slaying" demonstrated his control of his behavior. *Id.* at 205, 116 S.E.2d at 281. This evidence together with the ambiguous expert testimony support the trial judge's decision that Godley was not totally deprived of his ability to control his actions.

On the remaining issue we determine that there was sufficient evidence of malice to sustain the conviction of second degree murder. Godley's use of a firearm, his striking the victim before he shot her and their argument which preceded the shooting are facts upon which malice could have been found.

For the foregoing reasons the trial court's decision is affirmed.

*Affirmed.*

Keenan, J., concurred.

Benton, J., dissenting.

In *Thompson* v. *Commonwealth* the Supreme Court defined irresistible impulse as:

An impulse induced by, and growing out of some mental disease affecting the volitive, as distinguished from the perceptive, powers, so that the person afflicted, while able to understand the nature and consequences of the act charged against him and to perceive that it is wrong, is unable, because of such mental disease, to resist the impulse to do it. It is to be distinguished from mere passion or overwhelming emotion not growing out of, and connected with, a disease of the mind. Frenzy arising solely from the passion of anger and jealousy, regardless of how furious, is not insanity.

*Thompson* v. *Commonwealth*, 193 Va. 704, 717, 70 S.E.2d 284, 291-92 (1952).

I believe that the record in this case compels a conclusion that the trial judge did not perceive the nature of Godley's illness and misconstrued the irresistible impulse defense.

Prior to the shooting Godley had been referred to and was under the care of Dr. David L. Neimeier, a licensed clinical psychologist. Dr. Neimeier saw Godley on four separate occasions between February 29, 1984, the date of his first visit, and March 25, 1984, when Godley shot Giggetts. Dr. Neimeier testified that he diagnosed Godley as suffering from a "borderline personality disorder with paranoia."[1]

---

[1] Borderline personality disorder is recognized as a mental illness in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 3d ed. (1978).

During the course of treatment Dr. Neimeier determined that Godley had significant problems and was in need of psychotherapy. He also determined that Godley manifested an inability to maintain control when he became upset. Dr. Neimeier met with Godley and Giggetts because Godley was concerned about being unable to control his hostilities toward Giggetts. Dr. Neimeier testified:

A: Well, my impression was that the relationship with Ms. Giggetts was deteriorating, and that there was a likelihood that she might leave him because of his behavior towards her. I felt that that would be a severe stress on Mr. Godley and that would likely increase his depression and his paranoia, should this happen.

Q: Did you feel her leaving him would be a catastrophic, emotional event?

A: I would say it would be a severe emotional event.

THE COURT: There's nothing strange about that, is it, Doctor?

THE WITNESS: No.

THE COURT: If your girlfriend leaves you, everybody gets upset.

THE WITNESS: If you look at the stress level, one of the highest is the loss of a close loved one.

Q: Did you consider at that time whether or not Mr. Godley had the normal coping mechanism to deal with that kind of stress event?

A: I do not think he had the coping mechanism to do that.

Dr. Neimeier further testified that the extremity of the emotional situation confronted by Godley would cause within him a great deal of uncontrolled rage which Godley would have found difficult to control.

Dr. Mullaney, who provided psychiatric care to Godley after his arrest, testified that the extremity of the situation, as related to

him by Godley, was a matter of great provocation to Godley and made it difficult for Godley to control his actions.

Q: Now, how about in a circumstance of substantial or extreme provocation such as Polly Giggetts telling him that she no longer wanted the relationship and that the child that he thought was his was not his? How would that affect Ronnie Godley?

A: This would bring to the forefront the intensification of emotions he had been struggling with, sometimes successfully, sometimes unsuccessfully, over the last couple of years. He was already at that point, that is, after he had found she had left him and that she was intending now to stay away from him, even after he had hoped that maybe they were going to be able to reconcile. He was already down the line toward being concerned emotionally, intense about this, and to have it said to him, that one of his fears and preoccupations about this child was a true statement, would be very provocative.

Q: At the moment it was said, would he, in your opinion, be able to control his response at the moment it was said?

A: Well, if I can use the same term of borderline type of description, because in psychiatry we tend to think that we do need to understand why things happen, if they happened in a wrong way that they happened because the individual is overwhelmed by poor judgment, emotional difficulties, and other features connected with the situation. To the extent that the provocation and the emotions and the kind of controls the person has are not an extreme, it would be more difficult in the usual sense to control his actions. To the extent that we are, all of us, constantly doing this sort of thing, there is no clear distinction between what an individual who is suffering from the weaknesses of a personality disorder, and/or is under extreme provocation would be about to do.

Q: Do you expect that his impulse toward violence would be enhanced or influenced by this disorder?

A: Yes, certainly that is a feature.

Q: So, that he would be deprived of the coping mechanism of a person who didn't suffer from that disorder; is that correct?

A: If he doesn't have the capabilities that a normal person would have.

Q: So, you would not if confronted with this, you would not expect his reaction to be that of a normal person, given his personality disorder?

A: It is, of course, a combination of several factors. In this particular instance, all those factors were operative. So, it wasn't like the same kind of average situation where a spouse may leave a loved one.

Q: It wasn't that, it was exaggerated by this disorder?

A: It was.

Although it is true that Godley had the burden of proving to the satisfaction of the trier of fact that he was suffering from an irresistible impulse at the time of the commission of the act, I believe the record demonstrates that the trial judge misperceived the nature of the illness and the doctrine of irresistible impulse. The court's misperception is illustrated by the following colloquy between the court and Dr. Niemeier:

THE COURT: Most people are borderline somewhere, aren't they, in the eyes of the psychologist and psychiatrists? Is there a perfect person?

THE WITNESS: The diagnosis of borderline person would not be applied to the vast majority of people that are in the country.

THE COURT: In criminal trouble?

THE WITNESS: I think criminals would be diagnosed as an antisocial personality.

THE COURT: Even an embezzler is antisocial.

THE WITNESS: I can't really answer that. I think to make a diagnosis, the person would have to be evaluated.

THE COURT: The real question is, can he control his actions. You say he is borderline. That is a diseased mind, borderline, we don't know whether it is, whether it isn't. The results of that is, does he know the difference between right and wrong?

THE WITNESS: I think Mr. Godley is aware of the difference between right and wrong.

THE COURT: All right.

* * *

THE WITNESS: I am saying borderline indicates he has personality disorders.

THE COURT: Personality disorders. Everybody has a personality disorder. I do. You do.

THE WITNESS: Not according to—

THE COURT: Everybody has personality disorders, depression. Who sets the standard?

THE WITNESS: Standards for diagnoses are described.

THE COURT: By whom?

THE WITNESS: The medical profession.

THE COURT: Well—

THE WITNESS: And, they are written.

THE COURT: Are they Gods?

THE WITNESS: No.

THE COURT: Well, how can they set the standards? The law sets the standards, not the medical profession. In a work of art, you might set it. But, the law sets the standards. If you're having domestic troubles, wouldn't everybody be depressed unless you were happy to get rid of her?

THE WITNESS: Depression, but not necessarily suffer from a depressive neurosis.

THE COURT: Apparently, everybody I've known that's had domestic trouble suffered from suicidal, homicidal, all those things go through your mind. I guess I've handled more domestic cases than you have, Doctor. I am quite sure that I

have, over thirty-some years. But, you still say he knows the difference between right and wrong?

THE WITNESS: Yes.

THE COURT: That's the criteria. There was no irresistible impulse. He could control the impulse?

THE WITNESS: I am not clear on that because I wasn't present at the time.

I believe that a complete reading of the trial record demonstrates that the trial judge concluded that if Godley knew the difference between right and wrong there could be no defense of irresistible impulse.

The irresistible impulse doctrine is applicable only to that class of cases where the accused is able to understand the nature and consequences of his act *and knows it is wrong*, but his mind has become so impaired by disease that he is totally deprived of the mental power to control or restrain his act.

*Thompson* v. *Commonwealth*, 193 Va. at 718, 70 S.E.2d at 292. (emphasis added).

Although the trial judge was not required to accept the testimony of Drs. Neimeier and Mullaney as conclusive merely because they qualified as experts, *McLane* v. *Commonwealth*, 202 Va. 197, 205-06, 116 S.E.2d 274, 281 (1960), where, as here, the trial judge's statements on the record demonstrate a misunderstanding of the nature of Godley's illness and a belief that the irresistible impulse doctrine could not be applied because Godley knew the difference between right and wrong, I believe that the testimony of the medical experts was not given appropriate consideration. *Id.* at 206, 116 S.E.2d 281.

For these reasons I would reverse the conviction and remand for a new trial.