COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Huff and O'Brien
Argued by videoconference

UNPUBLISHED

JOHN CHRIS KIRIAKOU

v.      Record No. 0323-20-4

HEATHER KATHERINE KIRIAKOU

MEMORANDUM OPINION* BY
JUDGE GLEN A. HUFF
OCTOBER 13, 2020

FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Louise M. DiMatteo, Judge

Norman A. Thomas (Norman A. Thomas, PLLC, on briefs); for
appellant.

Edward V. O'Connor, Jr. (Edward V. O'Connor, Jr., P.C., on
brief), for appellee.

John Chris Kiriakou ("father") appeals the order of the Circuit Court for the County of

Arlington (the "trial court"), which, in relevant part, awarded Heather Katherine Kiriakou

("mother") sole legal and physical custody of father and mother's three children. Additionally,

father challenges the trial court's order requiring him to initiate revocation of the children's

Greek citizenship.

Father contends that the trial court erred in two respects. First, father contends that the

trial court's custody and visitation order was an abuse of discretion because it was not in the

children's best interests and not otherwise supported by evidence in the record. Second, father

asserts that the trial court's order requiring him to initiate revocation of the children's Greek

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

citizenship was in error because the trial court was without authority to issue that ruling and because mother never requested that relief in her pleadings.

This Court affirms the judgment of the trial court in part and reverses it in part. This Court affirms the trial court's custody and visitation order because the trial court did not abuse its discretion in fashioning that award. However, this Court reverses the trial court's order related to the children's Greek citizenship because that order was outside the scope of relief requested by mother in her pleadings.

## I. BACKGROUND

On appeal, this Court views the evidence in the light most favorable to the prevailing party and does not "retry the facts or substitute [its] view of the facts for [that] of the trial court." Congdon v. Congdon, 40 Va. App. 255, 266 (2003) (internal citations and quotation marks omitted). So viewed, the evidence is as follows:

After a marriage lasting approximately fifteen years, father and mother separated on May 16, 2017, and obtained a final order of divorce from the Arlington County Circuit Court on November 2, 2018. That final order of divorce incorporated the parties' marital settlement agreement ("MSA"), which, among other things, provided for a temporary custody arrangement whereby father and mother shared joint legal and physical custody over the children.

Not long after the divorce, and under a belief that the impetus for their divorce had been an alleged affair between mother and mother's current husband Nicholas Maan ("Maan"), father engaged in a series of actions that led to the relevant proceedings in this case. Father first obtained a computer belonging to mother and perused several emails between mother and Maan that contained sexual imagery and romantic discourse. In response, father hired a private investigator to follow mother and Maan and also sent both of them a number of explicit and accusatory emails outlining his disdain for them and their relationship. In addition, father

compiled the sexualized photos sent by mother to Maan and mailed them to mother and Maan's place of employment, Northrop Grumman Corporation, with accusations that the two were "embezzling" the company's resources by using those resources to advance their romantic relationship. Finally, in July of 2019, after learning that mother had taken the children to the wedding of Chris Kiriakou, an adult son of father from a prior marriage, father shattered a framed picture of mother's grandmother and left the destroyed remains at mother's doorstep.

On July 18, 2019, mother filed a verified petition and affidavit for rule to show cause as well as a motion to modify legal and physical custody in the trial court. In those pleadings, mother alleged that father committed multiple breaches of the MSA and requested that (1) the trial court award her sole legal and physical custody of the children, (2) the trial court order father to submit to an independent psychological evaluation, and (3) the trial court award her appropriate fees and costs. On August 9, 2019, the trial court ordered a rule to show cause directed to father.

The trial court set the show cause matter for a hearing to be tried concurrently with the custody determination on January 27-28, 2020. The trial court also entered an order for an independent psychological and custodial evaluation and appointed Dr. Christopher H. Lane ("Dr. Lane") to serve as an independent psychological evaluator for the purpose of conducting evaluations of father and mother and to otherwise provide analysis to assist the trial court in making its custody determination.

While the custody and show cause proceedings were pending and shortly after the picture frame shattering incident, mother separately sought a two-year protective order against father in the juvenile and domestic relations district court (the "JDR court"), which was granted on August 2, 2019. Father appealed the JDR court's ruling to the Arlington County Circuit Court,

and after a hearing on October 30, 2019, the circuit court also granted mother's request for a two-year protective order.

On January 24, 2020, Dr. Lane submitted his written report to the parties. That report was based on multiple psychological tests taken by mother and father, interviews with mother, father, and the children, as well as interviews with over thirty non-familial individuals.

Dr. Lane's report noted that both father and mother had "well-developed" parenting skills and also detailed the children's attachment to and affection for father and a desire to maintain the status quo with respect to his shared custody of them. Additionally, the report described the negative impact that father's behavioral patterns had on the children. Specifically, the report outlined father's habit of "denigrating" mother's character in the children's presence, which Dr. Lane concluded has "had an enormously unhealthy effect on the children's healing" from the fallout of their parents' separation. Additionally, the report described an unhealthy level of dependence father had on his children's loyalty and further identified that the children had taken on a "parentified" role in their relationship with father. Tying these concerns together, the report went on to state the following:

> [T]his evaluation would support the contentions of [mother] that [father] has confused his own interests with those of his children, has unhealthily involved them in his hurt and in his anger, has inappropriately engendered or strengthened negative feelings on the part of the children toward [mother], has interfered with the healing of the children as he struggled with his own healing, and has exercised poor control in statements to the children, those made around the children, and those made to individuals who have an ongoing relationship with the children. While there is data that he has made some degree of progress in these domains during recent months, he is seen as still manifesting a worrisome self-justifying position and an inattentiveness to costly collateral damage as he pursues self-serving goals.

Notwithstanding his concerns with the state of father's relationship with the children, Dr. Lane recommended that father and mother continue sharing joint legal custody of the

children.  Similarly, Dr. Lane recommended that for a four-month period, father's physical "custodial time with the children be restricted to alternating weeks from Friday after school to Monday morning at the beginning of the school day as well as one dinner visit with each child during each two week period[,]" with the expressed goal of reinstating equally shared physical custody between mother and father at the end of the four-month period.  Dr. Lane's recommendations were based on the stated preferences of the children, his belief that father's behavioral patterns would improve with therapy, and his view that fostering a continued relationship between the children and both parents was in the best interests of the children.

Dr. Lane testified to his report and recommendations at trial and reiterated his findings and opinions in his report.  Notably, Dr. Lane also suggested that visitation between father and the children take place in a therapeutic setting, where "boots-on-the-ground work between [father] and the children occur . . . [which] can be monitored by the therapist, it can be adjusted by the therapist[,] and it can be reported by the therapist."[1]

In addition to Dr. Lane's testimony, the trial court received other evidence related to custody matters and the children's best interests.  Among the other witnesses was father's psychiatrist Dr. Stephen Xenakis ("Dr. Xenakis").  Dr. Xenakis testified that father suffered from depression, anxiety, post-traumatic stress disorder, hypertension, and diabetes.  In his view, these medical illnesses diminished father's "ability to think and make decisions and act in a purposeful fashion and impair[] and interfere[] with good functioning in [his] daily life."

Although not mentioned in any of mother's pleadings, the issue of the children's Greek citizenship arose during mother's testimony.  In her testimony, mother alleged that father

---

[1] The record reflects that the two oldest children currently have mental health therapists with whom they regularly meet, but does not reflect that the youngest child has a therapist or receives any psychotherapeutic treatment.

obtained Greek citizenship for the children without her knowledge and that, as a result, there was a potential for the children to be drafted in the Greek military or for father to leave the United States and go to Greece with the children. In response to a question from her counsel on direct examination, mother for the first time made a request for relief regarding the children's Greek citizenship:

> [Counsel:]  Now, with this revelation today that [father] has gained Greek citizenship without your knowledge, what would you ask the Court to do?
>
> [Mother:]  Three things. I would ask the Court to order [father] to do whatever is needed to revoke the citizenship. I would ask the Court to order that [father] provide me with all of the applications and paperwork that went into them acquiring Greek citizenship, [and provide] all of the proof that the revocation of their citizenship had, indeed, been followed through.

Mother did not seek leave to amend her pleadings to include factual allegations or requests for relief regarding the Greek citizenship issue at any point before or after this testimony.

In his testimony on the Greek citizenship issue, father admitted that he had applied for the children's Greek citizenship in 2008 and officially obtained it for them in 2011. Father denied that mother was unaware of the children's Greek citizenship and alleged that mother actually co-signed the documentation necessary to obtain that citizenship. Father stated that the primary reason for obtaining Greek citizenship for the children was for them to enjoy work permits in the European Union and to have the ability to go to any public university in the European Union for free. Father also alleged that he had successfully petitioned the Greek government to waive the children's military service.

After reviewing the evidence, the trial court determined that granting sole legal and physical custody to mother was in the best interests of the children. Additionally, the trial court ordered that father's "visitation with the children, if any, shall take place only in a therapeutic

setting, at the frequency and duration suggested by the children's therapists and agreed to by [mother]."

Although the trial court's custody order did not adopt Dr. Lane's recommendations in full, the trial court relied upon findings in Dr. Lane's report detailing the negative impact that father's continual denigration of mother had on the children's well-being, the degree to which father's behavior undermined the children's relationship with mother, as well as the report's conclusion that an unhealthy relationship of "enmeshment" between father and the children existed. Moreover, the trial court's visitation order adopted Dr. Lane's suggestion that visitation between father and the children take place in a therapeutic setting. The trial court also relied on evidence outside of Dr. Lane's report, including the existence of the protective order against father, the materials sent to Northrop Grumman Corporation by father, and the current state of father's mental health. Viewing the totality of the evidence, the trial court determined that mother exhibited superior judgment and parenting skills and was therefore properly suited to have sole custody of the children.

After offering the reasons for its child custody and visitation order from the bench, the trial court permitted Dr. Lane and Dr. Xenakis to ask clarifying questions regarding the scope of that order. Both doctors were initially concerned that the trial court's order gave the children's therapists control over custody and visitation decisions, which they intimated was a responsibility beyond the therapists' qualifications and expertise. Additionally, Dr. Lane asked that the trial court clarify the precise expectation of the children's therapists so that the therapists would not confuse their role under the visitation order or run into potential ethical dilemmas flowing from their duties under that order.

In response to those concerns, the trial court explained that it was not the children's therapists who had ultimate authority over father's visitation with the children. Rather, the trial

court opined that the children's therapists were simply expected to monitor the children's progress in therapy, determine whether visitation in a therapeutic setting would further the children's progress, and if so, notify mother of their recommendation. After offering that explanation, the trial court asked each doctor at different points whether they understood the scope of the child custody order, to which both doctors answered in the affirmative.

On the Greek citizenship issue, the trial court ordered father to, within thirty days of January 29, 2020, "initiate revocation of the children's Greek citizenship" and to provide the court with "a copy of the revocation paperwork, and the original [citizenship] paperwork, if any, signed by [mother] seeking Greek citizenship for the children." Father filed a motion for reconsideration on February 19, 2020, in which he argued that the trial court lacked jurisdiction to order the revocation of the children's Greek citizenship and that its order presented a legal impossibility because under Greek law, only the children could revoke their citizenship and that revocation could not occur until they reached the age of majority. The motion for reconsideration was denied on February 26, 2020.

This appeal followed.

## II. STANDARD OF REVIEW

"In matters of custody, visitation, and related child care issues, the court's paramount concern is always the best interests of the child." Farley v. Farley, 9 Va. App. 326, 327-28 (1990). In reviewing a trial court's child custody and visitation decision, this Court will reverse on appeal only upon a showing that the trial court abused its discretion. Armstrong v. Armstrong, 71 Va. App. 97, 102 (2019). Additionally, where, as here, a trial court "hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986).

"An abuse of discretion occurs only 'when reasonable jurists could not differ' as to the proper decision." Reston Hosp. Ctr., LLC v. Remley, 63 Va. App. 755, 764 (2014) (quoting Brandau v. Brandau, 52 Va. App. 632, 641 (2008)).  Thus, even though a court by definition "abuses its discretion when it makes an error of law[,]" Robbins v. Robbins, 48 Va. App. 466, 475 (2006), the abuse of discretion standard "necessarily implies that, for some decisions, conscientious jurists could reach different conclusions based on exactly the same facts–yet still remain entirely reasonable[,]" Hamad v. Hamad, 61 Va. App. 593, 607 (2013).  Further, the abuse of discretion standard "rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." Id.

### III.  ANALYSIS

#### A.  Child Custody and Visitation Order

Father makes a series of arguments in support of his contention that the trial court's child custody and visitation order constituted an abuse of discretion.  Each are addressed in turn.

1. <u>The trial court did not abuse its discretion in differing with Dr. Lane's recommendation.</u>

Father first argues that the trial court's custody order was an abuse of discretion to the extent it differed from Dr. Lane's recommendation.  To that point, father concedes that the trial court was not bound by Dr. Lane's expert recommendations.  Nonetheless, he argues that the trial court's deviation from Dr. Lane's recommendations was an abuse of discretion because Dr. Lane was the only witness to offer an opinion on the issue of child custody and that opinion was uncontradicted by any contrary opinion from any other expert witness.

This argument is without merit.  It is well-settled that a trial court has "broad discretion in making decisions necessary to guard and to foster [children's] best interests." Eaton v. Dep't of Soc. Servs., 66 Va. App. 317, 324 (2016) (quoting Farley v. Farley, 9 Va. App. 326, 328 (1990)).  In exercising that discretion, a trial court is under no obligation to adopt a recommendation given

by an expert witness.  Street v. Street, 25 Va. App. 380, 387 (1997) ("[T]he fact finder is not required to accept the testimony of an expert witness merely because he or she has qualified as an expert." (citing McLane v. Commonwealth, 202 Va. 197, 205-06 (1960))).  Thus, as an initial matter, the trial court here was well within its authority when it declined to adopt Dr. Lane's recommendation respecting custody of the children.

Even so, the trial court's decision, although not in agreement with Dr. Lane's ultimate recommendation, was based in substantial part on the findings made in Dr. Lane's report.  The trial court noted that Dr. Lane's report outlined an unhealthy "enmeshment" between father and the children within which the children play a "parentified role" with father.  The trial court also relied on Dr. Lane's description of father's continual denigration of mother to the children, which, in the view of both the trial court and Dr. Lane, has had an "enormously unhealthy [e]ffect on [the children's] healing from the divorce in general."  Additionally, the trial court's visitation order was in accordance with Dr. Lane's suggestion that visitation between father and the children take place in a therapeutic setting.

The trial court's ruling was also supported by other evidence in the record.  To that end, the trial court relied on evidence such as the protective order against father, father's decision to send sexualized photos of mother to her place of employment, Dr. Xenakis's testimony as to father's compromised mental health, and father's efforts to undermine the children's relationship with mother.  As such, this Court does not agree with father's assertion that the trial court's child custody decision was an abuse of discretion for lack of evidentiary support.

2. The trial court's order does not improperly delegate authority over visitation matters
   to the children's therapists.

Father next argues that the trial court's visitation order improperly delegates authority over visitation matters to the children's therapists.  In particular, he claims that the trial court "repeatedly charged the children's therapists with responsibility to determine when the children

should visit John." From there, he argues that the trial court's order required the children's therapists to "depart from their proper professional roles" by unduly involving them in the visitation process. He further asserts that the portion of the trial court's order conditioning visitation upon mother's approval only "purported" to give mother responsibility over visitation matters, which suggests that ultimate responsibility over such matters rests with the children's therapists.

This argument mischaracterizes the trial court's order. The trial court did not, as father suggests, give the children's therapists ultimate authority over father's visitation with the children. Rather, the child custody order requires the children's therapists to monitor the children's progress in therapy, determine whether a therapy session where father is present would further the children's progress, and if so, to notify mother and give her the opportunity to either approve or disapprove of visitation between father and the children. In this way, it is mother, under the circuit court's order, who now has the day-to-day responsibility of deciding whether the children will have visitation with father.[2]

Moreover, to the extent father argues that the trial court's order requires the children's therapists to violate their professional and ethical obligations, this Court finds that no authority proffered by father supports that assertion. Father relies on an unpublished decision from this Court in Timmons v. Mutiso, No. 1158-17-4 (Va. Ct. App. Feb. 20, 2018), which he contends prevents child therapists from being charged with the responsibility of making custody or

_____

[2] Father alternatively takes issue with mother's role under the trial court's visitation order, arguing that if in fact mother has approval authority over the recommendations made by the children's therapists, then such authority would be derived from an unlawful "delegation" from the trial court over visitation matters. This is not so. Not only does father have the right to request modification of the trial court's visitation order at an appropriate time in the future, ante, at 13, but the trial court repeatedly emphasized that it retained ultimate authority over custody and visitation determinations and left open the possibility for either party to seek modification of its order at a later time.

visitation-related recommendations because such recommendations are outside child therapists' specialized qualifications. However, <u>Timmons</u> is not persuasive authority for the proposition that a trial court is prohibited from allowing therapists to be involved in visitation matters that are governed by a custody order. To the contrary, <u>Timmons</u> merely observed that when child therapists are qualified as expert witnesses *at trial* solely in their capacity as therapists or counselors, then any opinions from those therapists in the form of custody recommendations are outside the scope of the therapists' qualifications as an evidentiary matter. <u>Id.</u> at *6-7. Accordingly, this Court concludes that <u>Timmons</u> is inapposite and rejects father's argument that the trial court abused its discretion to the extent that its custody order involved the children's therapists in visitation matters.[3]

> 3. <u>The trial court's order does not deprive father of the ability to exercise visitation rights with the children.</u>

Father next argues that the trial court's visitation order "deprives [him] of any lawful means to enforce his visitation rights." In particular, he argues that, as the non-custodial parent, he "cannot inquire of the children's therapists or demand access to their records to determine (a) when and if they have recommended that he have visitation, or (b) whether [mother] has unreasonably withheld her consent to it." He also contests that the order unduly grants mother "veto power" such that father may never have the opportunity to have visitation with his children if mother exercises such power in bad faith and against his interests. This Court disagrees.

Contrary to his assertion, father's status as the non-custodial parent does not bar him from inquiring of the children's therapists as to whether they have made any recommendations as

---

[3] Notably, when viewing the evidence in the light most favorable to mother, the record reflects that when Dr. Lane and Dr. Xenakis raised the issue of the therapists' ethical obligations to the trial court, the trial court clarified the role of the therapists under the visitation order and alleviated those doctors' concerns on that front.

to visitation. In fact, Code § 20-124.6(A) provides for just the opposite. Specifically, it states that, "[n]otwithstanding any other provision of law, neither parent, regardless of whether such parent has custody, shall be denied access to the . . . health records . . . of that parent's minor child unless otherwise ordered by the court for good cause shown . . . ."

Likewise, this Court finds no error in the trial court's decision to give mother the responsibility of either approving or disapproving of the visitation recommendations given by the children's therapists. Although it is conceivable that mother could proceed in bad faith and unduly disapprove the visitation recommendations offered by the children's therapists, father's appropriate recourse in that situation would be to seek a modification of the trial court's custody and visitation order:

> Once a court has ruled on matters relating to the custody and care of minor children, and visitation rights of the non-custodial parent, the court retains jurisdiction throughout the minority status of the child[ren] involved. The court, in the exercise of its sound discretion, may alter or change custody or the terms of visitation when subsequent events render such action appropriate for the child[ren's] welfare.

Eichelberger v. Eichelberger, 2 Va. App. 409, 412 (1986).[4]

In addition, Code § 20-108 provides that "[t]he intentional withholding of visitation of a child from the other parent without just cause may constitute a material change of circumstances justifying a change of custody in the discretion of the court." That being the case, and in light of the other authority referenced, this Court determines that the trial court's visitation order does not divest father of the ability to enforce his visitation rights.

---

[4] Indeed, the trial court expressed that either party could "return to court . . . and revisit the issues" and also emphasized that the expectation was for mother to respect the need for the children to foster a healthy relationship with father and exercise her responsibilities appropriately under the custody order.

4. Father's argument regarding the application of the visitation order to the youngest child is waived.

Finally, father contends that the order as written makes it impossible for him to see the youngest child. Specifically, he argues that because a recommendation from the children's therapists is a condition precedent to him having any visitation with the children, the fact that the youngest child is currently without a therapist means that he will never be able to have visitation with that child.

This argument is beyond this Court's consideration because it was not asserted at the trial court and was raised for the first time in his reply brief on appeal. Arguments not timely raised are deemed waived. Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling . . . ."); see also Palmer v. Atlantic Coast Pipeline, LLC, 293 Va. 573, 580 (2017) (holding that argument raised for the first time in reply brief was waived); Whitley v. Commonwealth, 223 Va. 66, 79 n.2 (1982) ("[W]e will not notice a non-jurisdictional question raised for the first time in a reply brief filed in this Court."); Jeter v. Commonwealth, 44 Va. App. 733, 740-41 (2005) (holding that arguments cannot be developed for the first time in a reply brief or at oral argument).

By neglecting to raise the issue of the visitation order's application to the youngest child until filing his reply brief, father deprived mother of any "meaningful opportunity to address arguments and authorities" that he intended to rely upon. Jeter, 44 Va. App. at 740. Accordingly, this Court holds that any argument based on the issue is waived.[5] Rule 5A:18; Palmer, 293 Va. at 580.

---

[5] By finding that father waived this argument on appeal, we express no view as to whether the trial court's order as written renders any visitation between father and the youngest child impossible. We do note that the record reflects that the trial court did not intend such a

- 14 -

In sum, the trial court did not abuse its discretion in fashioning the child custody and visitation award. That award was supported by evidence in the record, did not improperly delegate authority over visitation matters to the children's therapists, and did not unduly deprive father of his ability to enforce his visitation rights. Additionally, because father's argument regarding application of the custody order to the youngest child is waived, this Court has no occasion to consider it on appeal.

### B. Greek Citizenship Revocation Order

Father contends that the trial court abused its discretion in ordering him to revoke the children's Greek citizenship and produce related documentation. Specifically, he argues that the trial court erred because no factual allegations or request for relief related to the children's Greek citizenship were presented in mother's pleadings and because mother never sought leave to amend her pleadings to request relief on the issue.[6] For her part, mother concedes that the issue of the children's Greek citizenship was not raised in her pleadings and that she made no motion for leave to amend the pleadings to include that issue. Nevertheless, she argues that the trial court properly exercised its discretion by issuing the Greek citizenship order because revocation

---

result, particularly because the trial court made no distinction between the youngest child and the other children either in its order or when explaining the reasons for its order from the bench. If the order as written blocks father from any visitation with the youngest child, the resolution will require agreement between the parties or a return to the trial court for clarification. See Eichelberger, 2 Va. App. at 412.

[6] Father offers two additional arguments against the trial court's Greek citizenship order. First, he contends that the trial court lacked authority to issue the Greek citizenship order because revocation of Greek citizenship may only be effectuated by the citizenship-holder at any time after the citizenship-holder becomes an adult, which would render the trial court's order a legal impossibility. Second, father asserts that the trial court was without statutory jurisdiction to grant any relief regarding a child's national citizenship, and even if it had such authority, the trial court failed to make any specific finding that revocation of the children's Greek citizenship was in their best interests. However, we need not address these arguments because we reverse the trial court's Greek citizenship order on the narrower ground that the trial court failed to base the order on any allegations or requests for relief in mother's pleadings.

of the children's Greek citizenship was consistent with the trial court's obligation to grant relief based on the children's best interests.

This Court agrees with father and holds that the trial court abused its discretion in issuing the Greek citizenship order because that order was not based on any allegations or requests for relief made in mother's pleadings. Under well-settled Virginia law, a "litigant's pleadings are as essential as his proof, and a court may not award particular relief unless it is substantially in accord with the case asserted in those pleadings. Thus, a court is not permitted to enter a decree or judgment order based on facts not alleged or on a right not pleaded and claimed." Dabney v. Augusta Mut. Ins. Co., 282 Va. 78, 86 (2011) (quoting Jenkins v. Bay House Assocs., 266 Va. 39, 43 (2003)). The purpose of pleadings is to "give notice to the opposing party of the nature and character of the claim [against him], without which the most rudimentary due process safeguards would be denied." Boyd v. Boyd, 2 Va. App. 16, 19 (1986).

Explained more thoroughly, the Supreme Court has said:

> The basis of every right of recovery under our system of jurisprudence is a pleading setting forth facts warranting the granting of the relief sought. It is the *sine qua non* of every judgment or decree. No court can base its decree upon facts not alleged, nor render its judgment upon a right, however meritorious, which has not been pleaded and claimed. . . . Pleadings are as essential as proof, the one being unavailing without the other. . . . Every litigant is entitled to be told by his adversary in plain and explicit language what is his ground of complaint or defense. . . . The issues in a case are made by the pleadings, and not by the testimony of witnesses or other evidence.

Ted Lansing Supply Co. v. Royal Aluminum & Constr. Corp., 221 Va. 1139, 1141 (1981) (quoting Potts v. Mathieson Alkali Works, 165 Va. 196, 207 (1935)). Thus, a court is without authority to issue an order unless it is based upon pleadings before it.

Mother's pleadings made no factual allegations relating to the Greek citizenship issue either explicitly or implicitly. Furthermore, the crux of the special relief requested by mother in

her pleadings related to custody of the children, orders finding appellant in contempt of a prior court order, and additional relief requiring father to submit to psychological evaluation. No request for relief was related to the Greek citizenship issue.

That mother included a general prayer requesting any relief the trial court deemed necessary and appropriate is unavailing. A general prayer "will support relief only for those matters placed in controversy by the pleadings and, thus, any relief granted must be supported by allegations of material facts in the pleadings that will sustain such relief." Jenkins v. Bay House Assocs., L.P., 266 Va. 39, 45 (2003); see also Gologanoff v. Gologanoff, 6 Va. App. 340, 346 (1988) ("The issues in a case are made by the pleadings . . . ."). Because mother did not make any factual allegations related to the Greek citizenship issue in her pleadings, any order involving the children's Greek citizenship based on mother's general prayer was outside the scope of what was put at issue in this case by mother's pleadings.

In short, while the Greek citizenship issue presented itself as a point of concern to mother in the midst of the trial proceedings, her appropriate course of action to seek redress on the issue was to move to amend her pleadings, not to seek relief based on her testimony in the absence of amended pleadings. Because mother failed to do so, this Court holds that the trial court's order against father regarding the children's Greek citizenship was an abuse of discretion.

C. The Trial Court's Award for Attorney's Fees

Father seeks a reduction of the trial court's award of attorney's fees to mother. "An award of attorney's fees is a matter submitted to the sound discretion of the trial court and is reviewable on appeal only for an abuse of discretion." Graves v. Graves, 4 Va. App. 326, 333 (1987). Additionally, the test for the appropriateness of a trial court's award of attorney's fees is "reasonableness under the circumstances." Joynes v. Payne, 36 Va. App. 401, 429 (2001) (citing McGinnis v. McGinnis, 1 Va. App. 272, 277 (1985)). Applying those principles, there is no

reason to disturb the trial court's order of attorney's fees. In paragraph 29 of the MSA, the parties agreed that the trial court "shall be empowered to award reasonable suit costs, fees, and legal fees and costs." In doing so, the trial court carefully considered the claims involved, the complexity of the parties' circumstances, and the balance of the equities at issue. In light of that consideration, and because there is no evidence in the record that the amount awarded was excessive or unreasonable, the trial court did not abuse its discretion in the award of attorney's fees to mother.

### D. Appellate Attorney's Fees

Both father and mother seek an award of appellate attorney's fees. On appeal, this Court "may award" some or all of the fees requested or "remand the issue to the circuit court . . . for a determination thereof." Rule 5A:30(b)(1)-(2). However, because there does not appear to be any equitable basis to require either party to bear the other's fees, this Court declines father and mother's requests for appellate attorney's fees.

### IV. CONCLUSION

This Court affirms the trial court's child custody and visitation order, but reverses its order requiring father to initiate revocation of the children's Greek citizenship and to produce related documentation. The trial court's custody and visitation order did not constitute an abuse of discretion because evidence in the record supports the order and the order was not otherwise impaired by reversible error. However, the trial court abused its discretion in ordering father to revoke the children's Greek citizenship and produce related documentation because mother never requested relief in her pleadings that in any way related to the children's Greek citizenship and never sought leave to amend her pleadings to request such relief.

Affirmed in part, and reversed in part.